**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **ABC IP, INC.; LAD, LLC; and LAWRENCE DEMONICO** | **CIVIL ACTION NO.:** 1-25-CV-01626 |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **SPIDER HOLE, LLC; SPIKE'S TACTICAL, LLC and MICHAEL REGISTER** | |
| **Defendants.** | |

---

**PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' AMENDED MOTION TO DISMISS**

---

Plaintiffs ABC IP, INC. ("ABC"), LAD, LLC ("LAD"), and Lawrence DeMonico ("DeMonico") (collectively, "Plaintiffs") file Plaintiffs' Response (the "Response") to Defendants Spider Hole, LLC ("Spider Hole"), Spike's Tactical, LLC ("Spike's"), and Michael Register's ("Register") (collectively, "Defendants") Amended Motion to Dismiss (the "Motion"), and would respectfully show the Court as follows:

## I.      SUMMARY

1.      This suit involves a business dispute arising from the parties' prior commercial relationships, during which Register, a non-resident, and Spider Hole and Spike's, the two non-resident entities he operates, became involved in Plaintiffs' operations and did extensive business with Plaintiffs, who are citizens of Texas. The suit is governed in part by a forum selection clause in an operating agreement between ABC, LAD, and Spider Hole (the "Agreement"), which designates the "federal and state courts of the State of Texas, County of Travis" as the exclusive

jurisdiction for any related litigation. *See* Ex. 2, Article XI, Section 11.8, pp. 31–32. A true and correct copy of the Agreement is attached hereto as **Exhibit 2** and incorporated herein by reference.

2.     Defendants' Amended Motion to Dismiss (Dkt. No. 12) is substantively identical to the original Motion to Dismiss (Dkt. No. 5)—to which Plaintiffs responded (Dkt. No. 7) and Defendants replied (Dkt. No. 9)—with one significant exception: Defendants have abandoned their assertions that they "lack sufficient minimum contacts with Texas" and "do not conduct business in Texas" and replaced them with a pleading deficiency argument regarding personal jurisdiction. This revision followed Plaintiffs' showing in their response that Spike's conducts millions of dollars of business in Texas through hundreds of dealers. A true and correct copy of the Plaintiffs' response to Defendants' original Motion to Dismiss is attached hereto as **Exhibit 1** and incorporated herein by reference. Plaintiffs adopt and incorporate all arguments, authorities, and evidence set forth in Exhibit 1 as if fully restated here and submit this Response to address the Amended Motion's modified personal jurisdiction argument.

## II.     <u>FACTS</u>

3.     Register operates Spider Hole and Spike's. Dkt. No. 1, ¶ 9. Register serves as the sole member of Spider Hole, while Register and his former wife are the sole members of Spike's. *Id.* at ¶¶ 4, 6. Register is also known as "Spike."[1] While Spider Hole is a shell company, Dkt. No. 1, ¶ 10, Spike's conducts extensive business in Texas, and Register and his entities have done business with DeMonico, who resides in Austin, Texas, for years. Dkt. No. 1, ¶¶ 9–11; Dkt. No. 7, ¶¶ 5–7; *id.* at Ex. 2.

4.     Register communicated with DeMonico to induce him to allow Register, through

---

[1] *See* SPIKE'S TACTICAL, *About Us*, https://www.spikestactical.com/about-us/ (last visited December 18, 2025).

one of his entities, to become a member of an entity with which DeMonico was associated. *See id.* at ¶ 10. Register ultimately formed Spider Hole and induced DeMonico to allow Register, through Spider Hole, to become a member of ABC IP, LLC, an entity with several members, including DeMonico's LAD. *See id.*

5.      On or about September 17, 2024, Spider Hole, LAD, and others entered into the Agreement drafted by an Austin-based law firm, with Register signing the Agreement on behalf of Spider Hole and DeMonico signing on LAD's behalf. *See id.* at ¶ 11; Ex. 2, p. 33. The Agreement contains a section titled "Jurisdiction and Venue," which reads:

> Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of Texas, County of Travis in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail addressed as provided in Exhibit A attached hereto, and that when service is so made, it shall be as if personal service was effected within the State of Texas.

Ex. 2, Section 11.8, pp. 31–32 (the "Forum Selection Clause").

6.      On September 27, 2024, Spider Hole was administratively dissolved by the State of Florida and would not be reinstated until April 9, 2025. Dkt. No. 1, ¶ 12.

7.      Between October 2022 and the filing of this suit, Register consistently made contact with DeMonico in Texas. *See* Dkt. No. 7, Ex. 3, ¶ 6.

8.      Prior to the immediate suit, LAD and DeMonico had previously filed and voluntarily dismissed without prejudice a suit against Defendants alongside ABC IP, LLC. *See ABC IP, LLC et al. v. Spider Hole, LLC et al.*, Cause No. 1:25-cv-00864 (W.D. Tex., dismissed without prejudice Oct. 9, 2025).

9.      For the reasons outlined in the testimony of Lawrence DeMonico, ABC IP, LLC assigned its interests relevant to this dispute to Plaintiff ABC IP, Inc., a domestic corporation registered to do business in Texas since 2023.

### III.    ARGUMENTS AND AUTHORITIES

**A.    Complete Diversity of Citizenship Exists Here.**

> *i.    Defendants rely on inapplicable, out-of-circuit case law.*

10.    Defendants rely on case law from federal circuits outside this Circuit where assignments of contractual rights between related or affiliated entities are presumed collusive. *See* Dkt. No. 12, p. 4. The Fifth Circuit has not addressed this issue, nor defined what entities qualify as "related" or "affiliated" in this context. *See Hunter Douglas, Inc. v. Menendez*, No. 4:21-CV-741, 2022 WL 811067, at *5 (E.D. Tex. Mar. 16, 2022). Indeed, federal circuit courts that have come to the issue are split.[2] The Eleventh Circuit rejected such a presumption and concluded that Supreme Court precedent instead supports a finding that "courts will not inquire into the motives when deciding jurisdiction" and that federal jurisdiction is proper where a plaintiff makes a bona fide, absolute transfer of his claims for the purpose of invoking federal jurisdiction "so long as the succession and transfer were actual, not feigned or merely colorable[.]" *Ambrosia Coal and Const. Co. v. Pages Morales*, 482 F.3d 1309, 1314–1315 (11th Cir. 2007).

> *ii.    Applying Fifth Circuit case law, complete diversity of citizenship exists here.*

11.    "When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), the district court has substantial authority 'to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Azteck Communications v. UPI Communications, Inc.*, No. CIV A H-09-0690, 2009 WL 1660288, at *3 (S.D. Tex. June 15, 2009). "When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to

---

[2] *Compare* Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469, 475 (2d Cir. 1976) (applying heightened scrutiny); McCulloch v. Velez, 364 F.3d 1, 6 (1st Cir. 2004) (applying a rebuttable presumption of collusion); *with* Ambrosia Coal and Const. Co. v. Pages Morales, 482 F.3d 1309, 1314 (11th Cir. 2007) (declining to apply a presumption of collusion); Herzog Contracting Corp. v. McGowen Corp., 976 F.2d 1062, 1067 (7th Cir. 1992) (declining to apply a presumption of collusion).

allow affidavits and other documents to resolve disputed jurisdictional facts . . . [and] may consider matters outside the pleadings, such as declarations or affidavits, to resolve a factual challenge to subject matter jurisdiction[.]" *Id.*

12.    Under 28 U.S.C. § 1332(a), federal district courts have diversity subject-matter jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332(a). Section 1332(a)'s complete diversity requirement "requires that all persons on one side of the controversy be citizens of different states than all persons on the other side." *McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004). The Fifth Circuit has established that the "citizenship of a[n] LLC is determined by the citizenship of all of its members," *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). "A party seeking to establish diversity jurisdiction must specifically allege the citizenship of every member of every LLC or partnership involved in a litigation." *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 536 (5th Cir. 2017).

13.    Meanwhile, "for corporations, citizenship is based on a corporation's state of incorporation and principal place of business." *Cadence Bank v. Johnson*, 160 F.4th 197, 202 (5th Cir. 2025). In determining a business's principal place of business, the Fifth Circuit applies the Supreme Court's "nerve center" test. *See id*. "Under that test, a corporation's principal place of business is the place 'where a corporation's officers direct, control, and coordinate the corporation's activities.' That place is usually 'where the corporation maintains its headquarters— provided that the headquarters is the actual center of direction, control, and coordination.'" *Id.* (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010)).

14.    "The assignment or transfer of a claim that is feigned or merely colorable, rather than absolute or genuine, and made for the sole purpose of creating diversity jurisdiction violates

Section 1359 as improper or collusive and does not create federal diversity jurisdiction." *Hunter Douglas*, 2022 WL 811067, at *4. The Fifth Circuit has applied a six-factor test, wherein the court first determines, in the light most favorable to the plaintiff, whether each factor ultimately weighs for or against jurisdiction and then considers the factors together:

> (1) whether there was nominal or no consideration involved in the assignment;
>
> (2) whether the assignee had any previous connection to the assigned claim;
>
> (3) whether there was a legitimate business reason for the assignment;
>
> (4) whether the timing of the assignment suggests it was merely an effort to secure federal diversity jurisdiction;
>
> (5) whether the assignor exercises any control over the conduct of the litigation; and
>
> (6) whether the assignor retains any interest in the action such as receiving a portion of the assignee's recovery.

*See Montes v. Tibbs*, No. 24-20135, 2024 WL 3842570, at *2 (5th Cir. Aug. 16, 2024), cert. denied, 145 S. Ct. 1140 (2025). It is the plaintiff's burden to show that the assignment was not executed to create diversity. *See id.* at *3.

15.     Here, the assignment of the claim was absolute and genuine, complete diversity exists and, thus, this Court has diversity jurisdiction over Defendants. Defendants do not dispute that Plaintiffs have specifically alleged the citizenship of every member of all the LLCs involved in this suit. *See* Dkt. No. 12, pp. 3–4; *see also* Dkt. No. 1, ¶¶ 1–6. All Plaintiffs and their members are citizens of Texas; all Defendants and their members are citizens of Florida. *See* Dkt. No. 1, ¶¶ 2, 4, 6. Plaintiffs also allege and Defendants also do not dispute that Plaintiff ABC, which is incorporated and has its principal place of business in Texas, is a citizen of Texas. *See* Dkt. No. 1, ¶ 1; Dkt. No. 12, pp. 3–4.

16.     Defendants allege the assignment from ABC IP, LLC to Plaintiff ABC was collusive. However, applying the *Montes* factors in the light most favorable to Plaintiffs, Plaintiffs

have met their burden to show the assignment was not executed to create diversity. ABC IP, LLC assigned its claims to Plaintiff ABC after determining that its members, other than DeMonico's LAD, were unable or unwilling to pursue the claims due to other matters and commitments. *See* Dkt. No. 7, Ex. 3, ¶¶ 7–8. Plaintiff ABC provided ABC IP, LLC with ample consideration in the amount of $500,000.00 in exchange for the assignment. *See* Dkt. No. 7, Ex. 3, ¶ 9. Plaintiff ABC has been registered to do business in Texas since 2023 and thus was not created to accept this assignment. *See* Dkt. No. 1, ¶ 1. And, as the assignment was total and absolute, ABC IP, LLC does not exercise any control over this litigation and retains no interest in the action. *See* Dkt. No. 7, Ex. 3, ¶ 9. Defendants' assertion that no assignment instrument was produced, Dkt. No. 9, p. 3, is meritless; the DeMonico Declaration attests to the assignment's terms under penalty of perjury. *See* Dkt. No. 7, Ex. 3.

17.    Accordingly, Plaintiff ABC is the real party in interest here. Defendants' related argument that ABC IP, LLC is a required party under Rule 19 whose joinder would destroy diversity likewise fails. *See* Dkt. No. 9, p. 3. Because the assignment was total and absolute, ABC IP, LLC retains no interest in these claims and thus is not a required party.

**B.    This Court Has Subject-Matter Jurisdiction Over Defendants.**

18.    Since Plaintiffs have established complete diversity and met their burden to show that Plaintiffs did not collusively manufacture diversity jurisdiction, this Court must deny Defendants' request to dismiss this action for lack of subject-matter jurisdiction.

**C.    This Court Has Personal Jurisdiction Over Defendants.**

19.    When personal jurisdiction is challenged by a motion to dismiss, the plaintiff bears the burden of proof to show a district court's jurisdiction over a non-resident defendant. *Bonner v. Triple-S Mgmt. Corp.*, 661 F. App'x 820, 821 (5th Cir. 2016). Unless the district court conducts an evidentiary hearing, the plaintiff need only present a prima facie case of jurisdiction. *Id.* (citing

*Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 (5th Cir. 1996)); *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020).

20.     In evaluating whether or not the plaintiff has made a prima facie case, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists." *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989). Moreover, the district court may consider not only the assertions made in plaintiff's pleadings but may also consider the contents of the entire record. *Hazim v. Schiel & Denver Book Publishers*, 647 F. App'x 455, 457 (5th Cir. 2016). The court may receive "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery" to resolve the jurisdictional issue. *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985); *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008).

  i. *Under the Agreement, Defendant Spider Hole and, through the closely-related doctrine, Defendants Spike's and Register consented to the personal jurisdiction of this Court.*

21.     Personal jurisdiction represents "an individual right . . . [that] can, like other such rights, be waived." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). "[I]f a party signs a contract with a forum selection clause, that party has either consented to personal jurisdiction on or waived the personal jurisdiction requirements for the designated forum." *MWK Recruiting, Inc. v. Jowers*, No. 1:18-CV-444-RP, 2019 WL 7761445, at *4 (W.D. Tex. July 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985)). "A mandatory [forum selection clause] affirmatively requires that litigation arising from the contract be carried out in a given forum. By contrast, a permissive [forum selection clause] is only a contractual waiver of personal-jurisdiction and venue objections if litigation is commenced

in the specified forum. Only mandatory clauses justify transfer or dismissal. [A forum selection clause] is mandatory only if it contains clear language specifying that litigation must occur in the specified forum-and language merely indicating that the courts of a particular place 'shall have jurisdiction' (or similar) is insufficient to make [a] [forum selection clause] mandatory." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016).

22.    The Fifth Circuit has also adopted the "closely-related doctrine," permitting "non-signatories [] to be bound by, and to enforce, forum selection clauses where, under the circumstances, the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Franlink Inc. v. BACE Services, Inc.*, 50 F.4th 432, 439–42 (5th Cir. 2022). In determining whether non-signatories are closely related, the Fifth Circuit considers the following: "(1) common ownership between the signatory and the non-signatory, (2) direct benefits obtained from the contract at issue, (3) knowledge of the agreement generally and (4) awareness of the forum selection clause particularly." *See id.* at 442.

23.    Here, the Forum Selection Clause is mandatory. It does not just state that the courts of Texas "shall have jurisdiction" over disputes under or related to the agreement; the clause mandates that such courts have "exclusive jurisdiction." *See* Ex. 2, Article XI, Section 11.8, pp. 31–32. It also specifies that any service of process at any location related to such a dispute "shall be as if personal service was effected within the State of Texas." *Id.*

24.    And, despite Defendants' claims to the contrary, all Defendants are bound by the Forum Selection Clause. Defendants do not, and cannot, dispute that Defendant Spider Hole was a signatory to the Agreement. *See* Dkt. No. 12, pp. 6–7; *see also* Ex. 2, p. 33. Defendants also do not dispute that Plaintiffs' claims arise from the Agreement. *See* Dkt. No. 12, pp. 6–7. Defendants' argument that tort claims fall outside the Agreement's scope, Dkt. No. 9, pp. 3–4, ignores that the

Forum Selection Clause covers disputes "arising out of or in connection with" the Agreement— language courts have interpreted broadly. *See* Ex. 2, Section 11.8. Instead, Defendants merely argue that Defendants Register and Spike's were not signatories to the Agreement. *See id.* But Defendants Register and Spike's are so closely related to the dispute and/or Spider Hole (Register and his wife are the only members of the company), a signatory to the Agreement, such that it was foreseeable that they would be bound by the Forum Selection Clause.

25.    All four *Franlink* factors support binding the non-signatory Defendants. First, Spider Hole and Spike's share common ownership by Register, and Register is even known as "Spike." Register also continued operating Spider Hole even after he let it be administratively dissolved. Second, as co-member of Spider Hole with his wife, Register, and by extension his entity Spike's, directly benefited from the Agreement financially and through stronger business connections with Plaintiffs. Third and fourth, Register negotiated, signed, and performed the Agreement on Spider Hole's behalf. *See* Dkt. No. 7, Ex. 3, ¶¶ 5–6. He was not a distant executive unaware of contractual terms. He was the sole decision-maker who personally agreed to designate Texas courts as the exclusive forum for related disputes. Under these circumstances, it was entirely foreseeable that Spike's and Register would be bound by the Forum Selection Clause alongside Spider Hole, and Defendants cannot now disclaim the jurisdiction to which they agreed.

    *ii.*    *Setting aside the Forum Selection Clause, this Court has personal jurisdiction.*

26.    Personal jurisdiction exists where the forum state's long-arm statute extends to the non-resident defendant and the exercise of jurisdiction comports with due process. *Grewal*, 971 F.3d at 490. "Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). When specific personal jurisdiction is alleged, as it is here, the plaintiff bears the burden to establish jurisdiction over the defendant with respect to each cause of action it

asserts. *Fairchild v. Barot*, 946 F. Supp. 2d 573, 577 (N.D. Tex. 2013).

27.    A defendant must have "'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Grewal*, 971 F.3d at 490. The Fifth Circuit has framed the inquiry as a three-step analysis:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;
>
> (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and
>
> (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Id.* The plaintiff bears the burden of proof on the first two prongs and then the burden shifts to the defendant to "make a compelling case" that the assertion of jurisdiction is unfair or unreasonable. *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018).

28.    In evaluating minimum contacts, "[a] single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001). The court may consider phone calls, text messages, and emails where a defendant intentionally contacted a Texas plaintiff as minimum contacts when the claims arise directly out of those communications. *See Pierce v. Aircraft Fin. Corp. LLC*, 512 F. Supp. 3d 753, 762–64 (S.D. Tex. 2021). For instance, in *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 491 (5th Cir. 2018), the Fifth Circuit found that "[t]he defendants should have reasonably anticipated being haled into Texas court as a result of reaching out to Texas via phone in order to garner business and make specific representations." *Trois*, 882 F.3d at 491. District courts applying *Trois* have found that out-of-state defendants who directed specific, business-related communications to Texas with the intent to cause a plaintiff "to rely on those statements and use much of its resources to" perform work should reasonably anticipate being "'haled into Texas

court[.]'" *See, e.g.*, *Renowned Chem. Sols. LLC v. CJ Chemicals LLC*, No. 4:21-CV-669, 2022 WL 3566937, at *5 (S.D. Tex. Aug. 17, 2022).

<b>a.    Defendants have minimum contacts with Texas.</b>

29.    Here, Defendants have minimum contacts with Texas. In breach of contract cases, "when a nonresident defendant takes 'purposeful and affirmative action,' the effect of which is 'to cause business activity, foreseeable by (the defendant), in the forum state,' such action by the defendant is considered a 'minimum contact' for jurisdictional purposes." *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1009 (5th Cir. 1982). "[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [] must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 223 (5th Cir. 2012). Here, Defendants did extensive business with DeMonico, a Texas resident, and conduct extensive business in Texas. *See* Dkt. No. 7, ¶¶ 5–7; *id.* at Ex. 2, ¶¶ 4–6. Further, the contracts Defendants sign to execute their business, such as the Agreement, name Texas as the intended forum state. Ex. 2, Section 11.8, pp. 31–32.

30.    "When determining whether a defendant has minimum contacts with a forum state for purposes of an unjust enrichment claim, the Fifth Circuit . . . has applied the standard minimum contacts analysis, focusing on the defendant's alleged activities in the forum state." *Crownover v. Crownover*, No. DR-15-CV-132-AM, 2016 WL 11522978, at *10 (W.D. Tex. Sept. 20, 2016) (citing *Pervasive Software*, 688 F.3d at 221). The analysis hinges on whether plaintiff establishes the defendant, in an individual capacity, "purposefully availed himself of the privilege of conducting business in Texas." *Pervasive Software*, 688 F.3d at 223.

31.    Further, "as an alternative to [the] traditional minimum contacts analysis, personal jurisdiction may be established over an individual or corporation through a piercing-the-corporate-

veil or alter-ego theory. Under that theory, a corporation and its individual alter ego are the same entity—the jurisdictional contacts of the one are the jurisdictional contacts of the other." *Massimo Motor Sports, LLC v. Shandong Odes Indus. Co., Ltd.*, No. 3:21-CV-2180-X, 2024 WL 1895086, at *1 (N.D. Tex. Apr. 30, 2024) (citing *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)).

32.    Here, Register purposefully availed himself of conducting business in Texas. Register personally negotiated the key terms of the Agreement, including the Forum Selection Clause. *See* Dkt. No. 7, Ex. 3, ¶ 5. He also personally approved and signed the Agreement. *See* Ex. 2, p. 33. The Agreement created continuing obligations with Texas, and it led to repeated communications with DeMonico in Texas and ongoing performance tied to Texas through DeMonico. *See* Ex. 2; Dkt. No. 7, Ex. 3, ¶ 6. Register was not a distant executive; he personally orchestrated the Texas-centered conduct giving rise to this dispute. Accordingly, Register's jurisdictional contacts act as the jurisdictional contacts of Spider Hole and Spike's, and vice versa. Spike's and Register's extensive business in Texas and Spider Hole's agreement to the Forum Selection Clause naming Texas as the intended forum state are functionally Register's own jurisdictional contacts with Texas. Thus, this Court has personal jurisdiction over all Defendants. As the primary participant in all Spider Hole and Spike's business dealings, Register cannot hide behind any fiduciary shield.

33.    Meanwhile, for tortious acts the Fifth Circuit has found that, "[w]hen a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor." *See McFadin v. Gerber*, 587 F.3d 753, 761

(5th Cir. 2009). "Even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999).

34.    Here, Defendants' tortious conduct caused tortious injury within the state of Texas by damaging Plaintiffs DeMonico, LAD, and ABC, all Texas citizens.

### b.    This action arises out of Defendants' minimum contacts with Texas.

35.    The next prong is "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts[.]" *Fairchild*, 946 F. Supp. 2d at 577. This requires the defendant's "suit-related conduct [to] create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The court must look to "the defendant's contacts with persons who reside there," and the state's exercise of jurisdiction "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* at 285–86.

36.    Here, Plaintiffs' claims arise out of Defendants' purposeful contacts with Texas. As the contacts outlined above show, Defendants' contacts with Texas relate to the claims. The operative facts in this case concern Defendants' negotiation, execution, and performance of agreements with citizens of Texas in which Defendants agreed Texas had jurisdiction, and the misrepresentations made to induce that agreement. All of Plaintiffs' claims arise directly from Defendants' Texas contacts because those contacts created contractual and fiduciary obligations that Defendants later breached. Further, Defendants' extensive contacts with Texas via their extensive business in the state also demonstrate that Defendants made contacts with Texas itself. *See* Dkt. No. 7, ¶¶ 5–7; *id.* at Ex. 2. Defendants' attempt to distinguish "general business presence" from "suit-related contacts," Dkt. No. 9, pp. 4–5, fails because Plaintiffs' claims arise directly from Defendants' Texas-directed conduct.

### c.    Exercise of personal jurisdiction over Defendants is fair and reasonable.

37.    The final prong asks "whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006). "The burden of proof shifts to the defendant to show that the exercise of personal jurisdiction is unfair or unreasonable based on five factors: (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies." *Id.*

38.    Here, Defendants have entirely failed to meet their burden. Defendants do not make any arguments addressing the element of fairness or reasonableness in their Motion. *See* Dkt. No. 12, Section III. Instead, fairness and reasonableness factors weigh in favor of personal jurisdiction in this Court. Defendants purposefully and extensively engaged in interstate commerce and cannot plausibly claim undue burden from litigating in Texas. Travel, electronic discovery, and remote proceedings also substantially reduce any hardship. Having deliberately profited from Texas commerce, Defendants cannot now characterize Texas litigation as unfair. Texas has a strong interest in providing a forum for its residents and businesses harmed by out-of-state actors, particularly when the injury was felt in Texas, as is the case here. That interest is heightened where Defendants' conduct was intentionally directed at a Texas business like LAD.

39.    In addition, requiring Plaintiff to litigate in a foreign forum would impose substantial expense and inefficiency, particularly where key witnesses, records, and damages are centered in Texas. Texas is the most efficient forum because much of the operative facts, evidence, and witnesses are concentrated here, and the dispute arises from a Texas-centered commercial relationship between the parties. Litigating in Texas avoids piecemeal litigation and inconsistent

judgments between the many parties in this case. Finally, exercising jurisdiction here advances the shared interests of the states in enforcing contractual obligations and deterring misconduct intentionally directed across state lines.

 *iii.*    *Defendants' pleading deficiency argument fails.*

 40.   In their Amended Motion to Dismiss, Defendants have materially changed their personal jurisdiction argument. In the original Motion to Dismiss, Defendants asserted that "Defendants lack sufficient minimum contacts with Texas to support general or specific jurisdiction. The alleged conduct occurred primarily in Florida, and Defendants do not conduct business in Texas." Dkt. No. 5, p. 6. In the Amended Motion, Defendants removed this factual assertion entirely and instead argue only that "Plaintiff has failed to plead that Defendants have sufficient minimum contacts with Texas to support general or specific jurisdiction." Dkt. No. 12, p. 6. By removing these assertions, Defendants have implicitly conceded that they cannot sustain their prior factual position in the face of Plaintiffs' contrary evidentiary showing.

 41.   However, Defendants' new pleading-deficiency argument fails under governing Fifth Circuit standards. When personal jurisdiction is challenged by a motion to dismiss and the district court does not conduct an evidentiary hearing, a plaintiff need only make a prima facie showing of personal jurisdiction. *Bonner*, 661 F. App'x at 821. In conducting this evaluation, the Court is not limited to the allegations in the complaint. Rather, the Court "may consider not only the assertions made in plaintiff's pleadings but may also consider the contents of the entire record." *Hazim v. Schiel & Denver Book Publishers*, 647 F. App'x 455, 457 (5th Cir. 2016).

 42.   Here, even if Defendants were correct that the complaint could have spelled out additional jurisdictional details, the record already provides the necessary jurisdictional facts through the sworn declarations and exhibits submitted with Plaintiffs' prior Response. The Declaration of Lawrence DeMonico establishes that Register personally negotiated and executed

the Operating Agreement containing a mandatory Texas forum-selection clause, and that Register repeatedly communicated with and directed performance by Plaintiffs in Texas. The Declaration of Alex Simmons establishes that Spike's maintains extensive commercial relationships with Texas dealers and generates substantial Texas sales. These facts, which are now part of the record before this Court, satisfy the prima facie standard.

43.     Plaintiffs' specific allegations in their Original Petition, as well as the evidentiary record, more than satisfy Plaintiffs' prima facie burden. Plaintiffs allege this Court has personal jurisdiction over Defendants "because they committed a tort in whole or in part in the State of Texas" and "consented to the jurisdiction of this court by agreeing to the forum selection clause[.]" Dkt. No. 1, ¶¶ 7–8. The complaint further alleges that "non-signatory Defendants Register and Spike's are bound to the forum selection provision because they are 'closely related' to Defendant Spider Hole." *Id.* at ¶ 8 n.3 (citing *Franlink*, 50 F.4th at 441). As to tortious conduct, the complaint alleges that Register "fraudulently induced Plaintiff DeMonico" through communications directed at Texas, *id.* at ¶ 10; that Register made false "promises to be the 'Money Guy'" to induce DeMonico to allow Register to obtain equity in ABC, *id.* at ¶ 13; and that these misrepresentations damaged Texas citizens, *id.* at ¶¶ 43–56. The complaint also alleges that conversion of property belonging to Texas plaintiffs occurred, *id.* at ¶¶ 35–37, and that Spider Hole breached fiduciary duties owed to a company with Texas members, *id.* at ¶¶ 66–69. These allegations, taken as true, establish that Defendants committed torts directed at Texas residents and consented to jurisdiction.

  *iv.*  <u>*In the alternative, Plaintiffs request leave to amend jurisdictional allegations.*</u>

44.     If, notwithstanding the foregoing, this Court concludes that the complaint's jurisdictional allegations should be pled with more specificity, Plaintiffs respectfully request leave to amend under Federal Rule of Civil Procedure 15(a)(2), which provides that "[t]he court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). When determining whether

to grant leave, the court's discretion is guided by five factors: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Vuoncino v. Forterra, Inc.*, 140 F.4th 200, 206–07 (5th Cir. 2025). However, "[t]here must be a substantial reason to deny leave to amend after considering those five factors." *Id.* at 207. Here, none of these factors counsel against granting leave. The case is in its early stages, there has been no discovery, and Defendants would suffer no prejudice from an amended complaint that adds clarifying jurisdictional allegations consistent with the existing record. Moreover, amendment would not be futile but, instead, clerical because the record already establishes the jurisdictional facts necessary to support personal jurisdiction over all Defendants.

### D.    Venue Is Proper in This Court.

45.    "A civil action may be brought in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated[.]" 28 U.S.C. § 1391(b)(2). Further, Defendants concede that venue is proper based upon a forum selection clause "if the claims fall within the scope of the forum selection clause and all parties are bound by it." Dkt. No. 12, p. 7 (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

46.    Once a defendant challenges venue, the plaintiff has the burden of demonstrating venue is proper. *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 396 (S.D. Tex. 2011). On a motion to dismiss for improper venue, "the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x. 612, 615 (5th Cir. 2007) (per curiam). "Thus, a plaintiff may show that venue is proper by 'setting forth facts that taken as true would establish venue.'" *Zurich Am. Ins. Co. v. Tejas Concrete & Materials Inc.*, 982 F. Supp. 2d 714, 719–20 (W.D. Tex. 2013).

47.     Here, venue is proper in this Court under the Agreement and 28 U.S.C. § 1391(b)(2). First, venue is proper here under the Forum Selection Clause, as the clause specifically mandates that any dispute under or in connection with the Agreement be brought in federal or state court in Texas. Defendant Spike's and Register are, as set out above, subject to the Agreement's forum clause because they are so closely related to Spider Hole and the dispute. Second, venue is proper because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Texas. DeMonico resides in Austin, Texas; LAD and ABC are Texas entities; the negotiations leading to the Operating Agreement were directed at Texas; ongoing performance under the Agreement was tied to Texas through DeMonico; and the injuries from Defendants' alleged tortious conduct were felt in Texas. Defendants' argument that venue is improper for tort claims ignores that these claims arise from the same nucleus of facts as the contract claims.

**E.      Neither Rule 41(a)(1)(B) Nor Rule 41(d) Applies Here.**

48.     The Fifth Circuit has found that, "[u]nder [its] precedent, dismissals based on jurisdictional issues must, by their very nature, be without prejudice." *Abdullah v. Paxton*, 65 F.4th 204, 208 n.3 (5th Cir. 2023). A rare exception is Federal Rule of Civil Procedure 41(a)(1), which applies only to voluntary dismissals initiated by the plaintiff in a cause of action. *See* FED. R. CIV. P. 41(a)(1). Under Rule 41(a)(1)(B), a plaintiff's notice of voluntary dismissal operates as an adjudication on the merits and not merely as a dismissal without prejudice when filed by a plaintiff who has already dismissed the same claim in another court. *Id.* at 41(a)(1)(B). That is, if a plaintiff files **two** voluntary dismissals of the same claim, then the plaintiff's **second** notice of dismissal acts as an adjudication on the merits. *See id.*

49.     Here, Defendants severely misapply Rule 41(a)(1)(B) to the facts in their Motion. As a preliminary matter, Plaintiff ABC IP, Inc. has never filed any previous lawsuits related to this

matter. It has never dismissed any claims relating to this matter—voluntarily or otherwise—let alone done so twice. Defendants misrepresent the holdings within the cases they cite.

50.     Defendants claim that Plaintiffs' petition constitutes a "second filing—based on the same claims—[that] operates as an adjudication on the merits, requiring dismissal with prejudice. *See Poloran Prods., Inc. v. Lybrand Ross Bros. & Montgomery*, 534 F. 2d 1012 (2d Cir. 1976)." Dkt. No. 12, p. 8. But *Poloran* addressed the effect of the filing of a second <u>voluntary dismissal</u>, not a second lawsuit. Defendants' assertion of anything different is simply misleading. Defendants further assert: "The net effect of the prior dismissal and refiling is a dismissal with prejudice, barring further litigation of the same claims. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 394 (1990)." Dkt. No. 12, p. 8. *Cooter* is likewise inapposite: the Court held only that the filing of a second <u>voluntary dismissal</u> operates as an adjudication on the merits.

51.     Under the plain text of Rule 41(a)(1)(B) and Defendants' own authorities, Defendants' claim that this case should be dismissed with prejudice is simply insupportable. Plaintiff ABC was not a party to the prior suit Defendants reference. This is not a refiling of the same claim by the same plaintiffs. Further, Defendants only allege that Plaintiffs have voluntarily dismissed this suit once before, not twice. Dkt. No. 12, p. 8. Thus, the Rule cannot apply.

52.     Meanwhile, under Rule 41(d), "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied." FED. R. CIV. P. 41(d). "Fee awards are permitted under Rule 41(d) only if the underlying statute defines 'costs' to include fees." *Portillo v. Cunningham*, 872 F.3d 728, 739 (5th Cir. 2017). Here, the Plaintiffs in this case are not the same set of plaintiffs who filed a previous lawsuit against Defendants and, thus, Rule 41(d) does not

apply. However, should this Court find Rule 41(d) applies, any costs awarded must not include attorney's fees unless an applicable underlying statute exists defining costs to include such fees.

<h2 style="text-align:center">IV.    <u>PRAYER</u></h2>

WHEREFORE, Plaintiffs respectfully request this Court deny Defendants' Motion; or, in the alternative, if this Court finds any pleading deficiency with respect to personal jurisdiction, grant Plaintiffs leave to amend their complaint; and grant Plaintiffs such other and further relief to which they may be justly entitled.

Dated: February 24, 2026                              Respectfully submitted,

By:  /s/ Jared Greathouse
    Jared A. Greathouse
    Texas State Bar No. 24077284
    Robert A. Rhodes
    Texas State Bar No. 24116958
    **MUNSCH HARDT KOPF & HARR, P.C.**
    1717 West 6th Street, Suite 250
    Austin, Texas 78703
    Telephone: 512.391.6100
    Facsimile: 512.391.6149
    Email: jgreathouse@munsch.com
    Email: rrhodes@munsch.com

**ATTORNEYS FOR PLAINTIFFS ABC IP, INC, LAD, LLC, AND LAWRENCE DEMONICO**

<h2 style="text-align:center"><u>CERTIFICATE OF SERVICE</u></h2>

I hereby certify that on February 24, 2026, a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system.

/s/ Jared Greathouse

# EXHIBIT 1

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**ABC IP, INC.; LAD, LLC; and
LAWRENCE DEMONICO**

    **Plaintiffs,**

    **v.**

**SPIDER HOLE, LLC; SPIKE'S TACTICAL,
LLC and MICHAEL REGISTER**

    **Defendants.**

**CIVIL ACTION NO.:** 1-25-CV-01626

**JURY TRIAL DEMANDED**

## PLAINTIFFS' RESPONSE TO
## DEFENDANTS' MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiffs ABC IP, INC. ("ABC"), LAD, LLC ("LAD"), and Lawrence DeMonico ("DeMonico") (collectively, "Plaintiffs") and files Plaintiffs' Response (the "Response") to Defendants Spider Hole, LLC, Spike's Tactical, LLC, and Michael Register's Motion to Dismiss (the "Motion to Dismiss"), and would respectfully show the Court as follows:

## I.    <u>SUMMARY</u>

1.    This suit involves a business dispute arising from the parties' prior commercial relationships, during which Defendant Michael Register ("Register"), a non-resident, and the two non-resident entities he operates, Defendant Spider Hole, LLC ("Spider Hole") and Defendant Spike's Tactical, LLC ("Spike's") (collectively with Register, "Defendants"), became involved in Plaintiffs' operations and did extensive business with Plaintiffs, who are all citizens of Texas.

2.    This suit is also governed in part by a forum selection clause in an operating agreement between Plaintiffs ABC and LAD and Defendant Spider Hole (the "Agreement"). A

true and correct copy of the Operating Agreement is attached hereto as **Exhibit 1** and incorporated herein by reference. Under that clause, which Plaintiffs contend binds all Defendants, Defendants agreed to designate the "federal and state courts of the State of Texas, County of Travis" as the exclusive jurisdiction for any litigation related to the agreement. *See* Ex. 1, Article XI, Section 11.8, pp. 31–32.

3.      Now, Defendants move to dismiss this case, claiming lack of complete diversity, lack of subject-matter and personal jurisdiction, improper venue, and that dismissal with prejudice is required here. *See* Dkt. No. 5, pp. 3–8. However, Plaintiff has established subject-matter jurisdiction, personal jurisdiction, and proper venue in this case, and contends that Defendants misapply Rule 41.

## II.      FACTS

4.      Register operates Spider Hole and Spike's. Dkt. No. 1, ¶ 9. Register serves as the sole member of Spider Hole, and Register and his former wife, Angela M. Register, are the sole members of Spike's. *Id.* at ¶ 4, 6. Register is also known as "Spike."[1]

5.      While Spider Hole is a shell company, Dkt. No. 1, ¶ 10, Spike's sells to firearms dealers across the country, including in the state of Texas.[2] Spike's conducts extensive business in Texas. A true and correct copy of the Declaration of Alex Simmons is attached hereto as **Exhibit 2** and incorporated herein by reference; *see* Ex. 2, ¶¶ 4–6. For instance, two of Spike's' largest distributors are in Texas and have generated millions of dollars in revenue for Defendants. *See id.*

---

[1] *See* SPIKE'S TACTICAL, *About Us*, https://www.spikestactical.com/about-us/ (last visited December 18, 2025).
[2] *See* SPIKE'S TACTICAL, *Find A Dealer,* https://www.spikestactical.com/find-a-dealer/ (last visited December 18, 2025).

6. Further, Spike's' website shows at least twenty-five (25) dealers of its products within fifty miles of 501 W 5th St, Austin, TX 78701, and approximately three hundred fifty (350) dealer locations state-wide.[3] A map of Spike's' Texas dealers can be found on their website, as shown in the screenshots below:



A screenshot of the map of Spike's Tactical's Texas dealers on Spike's "Find A Dealer" webpage.[4]



A second screenshot of the map of Spike's Tactical's Texas dealers on Spike's "Find A Dealer" webpage.[5]

---

[3] *See id.*
[4] *See id.*
[5] *See id.*

7.     And, since at least October 2022, Register and at least one of Register's entities have done business with DeMonico, who then and now resides in Austin, Texas, and at least one of DeMonico's entities. *See* Dkt. No. 1, ¶¶ 9–34.

8.     Register communicated with DeMonico to induce him to allow Register, through one of his entities, to become a member of an entity with which DeMonico was associated. *See id.* at ¶ 10. Register ultimately formed Spider Hole and induced DeMonico to allow Register, through Spider Hole, to become a member of ABC IP, LLC, an entity with several members, including DeMonico's LAD. *See id.*

9.     On or about September 17, 2024, Spider Hole, LAD, and others entered into the Agreement drafted by an Austin-based law firm, with Register signing the Agreement on behalf of Spider Hole and DeMonico signing on LAD's behalf. *See id.* at ¶ 11; Ex. 1, p. 33. The Agreement contains a section titled "Jurisdiction and Venue," which reads:

> Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of Texas, County of Travis in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail addressed as provided in Exhibit A attached hereto, and that when service is so made, it shall be as if personal service was effected within the State of Texas.

Ex. 1, Section 11.8, pp. 31–32. (the "Forum Selection Clause").

10.    On September 27, 2024, Spider Hole was administratively dissolved by the State of Florida and would not be reinstated until April 9, 2025. Dkt. No. 1, ¶ 12.

11.    Between October 2022 and the filing of this suit, Register consistently made contact with DeMonico in Texas. A true and correct copy of the Declaration of Lawrence DeMonico is attached hereto as **Exhibit 3** and incorporated herein by reference; *see* Ex. 3, ¶ 6.

12.    Prior to the immediate suit, LAD and DeMonico had previously filed and voluntarily dismissed without prejudice a suit against Defendants alongside ABC IP, LLC. *See*

*ABC IP, LLC et al. v. Spider Hole, LLC et al.*, Cause No. 1:25-cv-00864 (W.D. Tex., dismissed without prejudice Oct. 9, 2025).

13.     ABC IP, LLC assigned its interests relevant to this dispute to Plaintiff ABC IP, Inc., a domestic corporation registered to do business in Texas since 2023.

## III.     ARGUMENTS AND AUTHORITIES

### A.     Complete Diversity of Citizenship Exists Here.

#### i.     Defendants rely on inapplicable, out-of-Circuit case law.

12.     Defendants rely on case law from federal circuits outside the Fifth Circuit where assignments of contractual rights between related or affiliated entities are presumed collusive. *See* Dkt. No. 5, p. 4. However, the Fifth Circuit has not addressed this issue, nor defined what entities qualify as "related" or "affiliated" in this context. *See Hunter Douglas*, 2022 WL 811067, at *5. Indeed, federal circuit courts that have come to the issue are split.[6] For instance, the Eleventh Circuit rejected such a presumption. *Ambrosia Coal*, 482 F.3d at 1314–15. Indeed, the Eleventh Circuit concluded that Supreme Court precedent instead supports a finding that "courts will not inquire into the motives when deciding jurisdiction" and that federal jurisdiction is proper where a plaintiff makes a bona fide, absolute transfer of his claims for the purpose of invoking federal jurisdiction "so long as the succession and transfer were actual, not feigned or merely colorable[.]" (internal quotations and citation omitted). *Id.*

#### ii.     Applying Fifth Circuit case law, complete diversity of citizenship exists here.

---

[6] *Compare* Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469, 475 (2d Cir. 1976) (applying heightened scrutiny); McCulloch v. Velez, 364 F.3d 1, 6 (1st Cir. 2004) (applying a rebuttable presumption of collusion); *with* Ambrosia Coal and Const. Co. v. Pages Morales, 482 F.3d 1309, 1314 (11th Cir. 2007) (declining to apply a presumption of collusion); Herzog Contracting Corp. v. McGowen Corp., 976 F.2d 1062, 1067 (7th Cir. 1992) (declining to apply a presumption of collusion).

13.     "When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), the district court has substantial authority 'to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Azteck Communications v. UPI Communications, Inc.*, No. CIV A H-09-0690, 2009 WL 1660288, at *3 (S.D. Tex. June 15, 2009) (citation omitted). "When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits and other documents to resolve disputed jurisdictional facts . . . . [and] may consider matters outside the pleadings, such as declarations or affidavits, to resolve a factual challenge to subject matter jurisdiction[.]" *Id.*

14.     Under 28 U.S.C. § 1332(a), federal district courts have diversity subject-matter jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332(a). Section 1332(a)'s complete diversity requirement "requires that all persons on one side of the controversy be citizens of different states than all persons on the other side." *McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004). The Fifth Circuit has established that the "citizenship of a[n] LLC is determined by the citizenship of all of its members," *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). "A party seeking to establish diversity jurisdiction must specifically allege the citizenship of every member of every LLC or partnership involved in a litigation." *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 536 (5th Cir. 2017).

15.     Meanwhile, "for corporations, citizenship is based on a corporation's state of incorporation and principal place of business." *Cadence Bank v. Johnson*, No. 24-10812, 2025 WL 3268757, at *3 (5th Cir. Nov. 24, 2025). In determining a business' principal place of business, the Fifth Circuit applies the Supreme Court's "nerve center" test. *See id.* "Under that test, a corporation's principal place of business is the place 'where a corporation's officers direct, control,

and coordinate the corporation's activities.' That place is usually 'where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination.'" *Id.* (citing Hertz Corp. v. Friend, 559 U.S. 77, 92–93 (2010)).

16.     Accordingly, federal district courts may not exercise jurisdiction over a suit in which any party has been improperly or collusively joined to manufacture federal diversity jurisdiction. 28 U.S.C. § 1359. "The assignment or transfer of a claim that is feigned or merely colorable, rather than absolute or genuine, and made for the sole purpose of creating diversity jurisdiction violates Section 1359 as improper or collusive and does not create federal diversity jurisdiction." *Hunter Douglas, Inc. v. Menendez*, No. 4:21-CV-741, 2022 WL 811067, at *4 (E.D. Tex. Mar. 16, 2022) (citing *Harrell & Sumner Contracting Co. v. Peabody Petersen Co.*, 546 F.2d 1227, 1229 (5th Cir. 1977)).

17.     The Fifth Circuit has applied a six-factor test, wherein the court first determines, in the light most favorable to the plaintiff, whether each factor ultimately weighs for or against jurisdiction and then considers the factors together:

(1) whether there was nominal or no consideration involved in the assignment;

(2) whether the assignee had any previous connection to the assigned claim;

(3) whether there was a legitimate business reason for the assignment;

(4) whether the timing of the assignment suggests it was merely an effort to secure federal diversity jurisdiction;

(5) whether the assignor exercises any control over the conduct of the litigation; and

(6) whether the assignor retains any interest in the action such as receiving a portion of the assignee's recovery.

*See Montes v. Tibbs*, No. 24-20135, 2024 WL 3842570, at *2 (5th Cir. Aug. 16, 2024), cert. denied, 145 S. Ct. 1140, 220 L. Ed. 2d 436 (2025). It is the plaintiff's burden to show that the assignment was not executed to create diversity. *See id.* at *3.

18.     Here, complete diversity exists and, thus, this Court has diversity jurisdiction over Defendants. Defendants do not dispute that Plaintiffs have specifically alleged the citizenship of every member of all the LLCs involved in this suit. *See* Dkt. No. 5, p. 3–4; *see also* Dkt. No. 1, ¶¶ 1–6. All Plaintiffs and their members, if any, are citizens of Texas; all Defendants and their members, if any, are citizens of Florida. *See* Dkt. No. 1, ¶¶ 2, 4, 6. Plaintiffs also allege and Defendants also do not dispute that Plaintiff ABC, which is incorporated and has its principal place of business in Texas, is a citizen of Texas. *See* Dkt. No. 1, ¶ 1; Dkt. No. 5, p. 3–4.

19.     Instead, Defendants allege the assignment of interests from ABC IP, LLC to Plaintiff ABC was collusive. Applying the six-factor test in *Montes*, the factors here, when considered together in the light most favorable to Plaintiffs, demonstrate that Plaintiffs have met their burden to show that the assignment was not executed to create diversity jurisdiction. ABC IP, LLC assigned its claims to Plaintiff ABC after determining that its members other than DeMonico's LAD were unable or unwilling to pursue the claims due to other matters and commitments. *See* Ex. 3, ¶¶ 7–8. Plaintiff ABC provided ABC IP, LLC with ample consideration in the amount of $500,000.00 in exchange for the assignment. *See* Ex. 3, ¶ 9. Further, ABC IP, Inc. has been registered to do business in Texas since 2023 and thus was in no way created simply to accept this assignment. *See* Dkt. No. 1, ¶ 1. And, as the assignment was total and absolute, *see* Ex. 3, ¶ 9, ABC IP, LLC does not exercise any control over the conduct of this suit, and neither does it retain any interest in this action.

20.     Accordingly, due to the above-described assignment, Plaintiff ABC is the real party in interest here, with the right to sue and ABC IP, LLC has no remaining interest.

**B.      This Court Has Subject-Matter Jurisdiction Over Defendants.**

21.     As set forth above, Plaintiffs have established complete diversity of the parties and met their burden to show that Plaintiffs did not collusively manufacture diversity jurisdiction.

Accordingly, this Court must deny Defendants' request to dismiss this action for lack of subject-matter jurisdiction.

## C. This Court Has Personal Jurisdiction Over Defendants.

22.    When personal jurisdiction is challenged by a motion to dismiss, the plaintiff bears the burden of proof to show a district court's jurisdiction over a non-resident defendant. *Bonner v. Triple-S Mgmt. Corp.*, 661 F. App'x 820, 821 (5th Cir. 2016). Unless the district court conducts an evidentiary hearing, the plaintiff need only present a prima facie case of jurisdiction. *Id.* (citing *Felch v. Transportes Lar–Mex SA DE CV*, 92 F.3d 320, 326 (5th Cir. 1996)); *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020), cert. denied, 209 L. Ed. 2d 504, 141 S. Ct. 1736 (2021).

23.    In conducting an evaluation of whether or not the plaintiff has made a prima facie case, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor[.]" *Fairchild v. Barot*, 946 F. Supp. 2d 573, 577 (N.D. Tex. 2013) (internal quotations and citations omitted); *see also Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000). Moreover, the district court may consider not only the assertions made in plaintiff's pleadings but may also consider the contents of the entire record. *Hazim v. Schiel & Denver Book Publishers*, 647 F. App'x 455, 457 (5th Cir. 2016). The court may receive interrogatories, depositions, or any combination of discovery methods to help it resolve the jurisdictional issue. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (internal quotations and citations omitted); *Fairchild*, 946 F. Supp. 2d at 577.

### i.    Under the Agreement, Defendant Spider Hole and, through the closely-related doctrine, Defendants Spike's and Register consented to the personal jurisdiction of this Court.

24.    Personal jurisdiction represents "an individual right . . . [that] can, like other such rights, be waived." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694,

703, 102 S. Ct. 2099, 2105 (1982). "[I]f a party signs a contract with a forum selection clause, that party has either consented to personal jurisdiction on or waived the personal jurisdiction requirements for the designated forum." *MWK Recruiting, Inc. v. Jowers*, No. 1:18-CV-444-RP, 2019 WL 7761445, at *4 (W.D. Tex. July 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985)). "A mandatory [forum selection clause] affirmatively requires that litigation arising from the contract be carried out in a given forum. By contrast, a permissive [forum selection clause] is only a contractual waiver of personal-jurisdiction and venue objections if litigation is commenced in the specified forum. Only mandatory clauses justify transfer or dismissal. [A] [forum selection clause] is mandatory only if it contains clear language specifying that litigation must occur in the specified forum-and language merely indicating that the courts of a particular place "shall have jurisdiction" (or similar) is insufficient to make [a] [forum selection clause] mandatory." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016).

25.     The Fifth Circuit has also adopted the "closely-related doctrine," which permits "non-signatories to an agreement to be bound by, and to enforce, forum selection clauses where, under the circumstances, the non–signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Franlink Inc. v. BACE Services, Inc.*, 50 F.4th 432, 439–42 (5th Cir. 2022) (internal quotation omitted). In determining whether non-signatories are closely related, the Fifth Circuit has no rigid test but considers the following: "(1) common ownership between the signatory and the non-signatory, (2) direct benefits obtained from the contract at issue, (3) knowledge of the agreement generally and (4) awareness of the forum selection clause particularly." *See id.* at 442.

26.     Here, the Forum Selection Clause is mandatory. It does not just state that the courts of Texas "shall have jurisdiction" over disputes under or related to the agreement, the clause

mandates that such courts have "exclusive jurisdiction." *See* Ex. 1, Article XI, Section 11.8, pp. 31–32. The clause also specifies that any service of process at any location related to such a dispute "shall be as if personal service was effected within the State of Texas." *Id.*

27.    And, despite Defendants' claims to the contrary, all Defendants are bound by the Forum Selection Clause. Defendants do not, and cannot, dispute that Defendant Spider Hole was a signatory to the agreement. *See* Dkt. No. 5, p. 6–7; *see also* Ex. 1, p. 33. Defendants also do not dispute that Plaintiffs' claims arise from the Agreement. *See* Dkt. No. 5, p. 6–7. Instead, Defendants merely argue that Defendants Register and Spike's were not signatories to the Agreement. *See id.* But Defendants Register and Spike's are so closely related to the dispute and/or Spider Hole, a signatory to the Agreement, such that it was foreseeable that they would be bound by the Forum Selection Clause.

28.    First, Register owns both Spider Hole and Spike's, which thus share common ownership. The two entities have a close relationship, as they are operated by the same person, Register. Register is even known as "Spike."[7] Register also continued operating Spider Hole even after he let it be administratively dissolved. *See* Dkt. No. 1, ¶ 12. Second, as the sole proprietor of Spider Hole, Register and by extension his entity Spike's directly benefited from the Agreement financially and through stronger business connections with Plaintiffs. Third and fourth, as the individual who signed the Agreement on Spider Hole's behalf, Register, and by extension his entity Spike's, cannot dispute that he and thus Spike's had knowledge of the Agreement generally and the Forum Selection Clause particularly. As the representative for Spider Hole, Register was

---

[7] *See* SPIKE'S TACTICAL, *About Us*, https://www.spikestactical.com/about-us/ (last visited December 18, 2025).

deeply involved in the negotiation, execution, and performance of the Agreement. *See* Ex. 3, ¶¶ 5–6.

### ii. Even setting aside the Forum Selection Clause, this Court still has personal jurisdiction over Defendants.

29.     Personal jurisdiction exists where the forum state's long-arm statute extends to the non-resident defendant and the exercise of jurisdiction comports with due process. *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020), cert. denied, 209 L. Ed. 2d 504, 141 S. Ct. 1736 (2021). "Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge." *Id.* (quoting *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019)). Though personal jurisdiction can be general or specific, this case implicates the latter. When the plaintiff alleges specific personal jurisdiction exists, the plaintiff bears the burden to establish jurisdiction over the defendant with respect to each cause of action it asserts, such that the court must separately conduct a jurisdictional analysis for each cause of action asserted. *Fairchild*, 946 F. Supp. 2d at 577.

30.     "The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Defense Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). The Fifth Circuit has framed the inquiry as a three-step analysis:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;
>
> (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and
>
> (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Id.* The plaintiff bears the burden of proof on the first two prongs and, only after those factors have been established, the burden then shifts to the defendant to "make a compelling case" that the assertion of jurisdiction is unfair or unreasonable. *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018).

31.    In evaluating minimum contacts, "[a] single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001). The court may consider phone calls, text messages, and emails where a defendant's employee or agent intentionally reached out to a plaintiff in Texas as "minimal contacts" on which the Court may base personal jurisdiction upon when the causes of action arise directly out of those communications. *Pierce*, 512 F. Supp. 3d at 754. For example, when an out-of-state defendant directed communications to Texas with the intent to cause a Plaintiff "to rely on those statements and use much of its resources to manufacture and package a multitude of hand sanitizer[,]" then those communications or contacts were "of the sort in which [the defendant] should have reasonably anticipated being 'haled into Texas court' as a result of reaching out to Texas to make specific, business-related representations." *Renowned Chem. Sols. LLC v. CJ Chemicals LLC*, No. 4:21-CV-669, 2022 WL 3566937, at *5 (S.D. Tex. Aug. 17, 2022).

### a.    Defendants have minimum contacts with Texas.

32.    The first prong of the analysis is whether Defendants have minimum contacts with Texas. In breach of contract cases, the rule developed by the Fifth Circuit "is that when a nonresident defendant takes 'purposeful and affirmative action,' the effect of which is 'to cause business activity, foreseeable by (the defendant), in the forum state,' such action by the defendant is considered a 'minimum contact' for jurisdictional purposes." *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1009 (5th Cir. 1982). "Although simply contracting with a Texas company is not enough to confer minimum contacts, the terms of the contract and the parties'

course of dealing, negotiations, contemplated future consequences, and a choice of law clause are all considered." *Legacy Med. Consultants, L.P. v. Charles*, No. 4:25-CV-00492-O, 2025 WL 3125925, at *3 (N.D. Tex. Sept. 2, 2025).

33.    Here, Defendants not only did extensive business with DeMonico, a Texas resident, *see* Ex. 3, they have conducted millions of dollars of business in Texas, *see* Ex. 2, ¶¶ 4–6, and have dozens, if not hundreds, of dealers of their products in Texas.[8] And, the contracts that Defendants sign to execute their business, such as the Agreement, clearly name Texas as the intended forum state. *See* Ex. 1, Section 11.8, pp. 31–32.

34.    "When determining whether a defendant has minimum contacts with a forum state for purposes of an unjust enrichment claim, the Fifth Circuit has not applied the Calder effects test; instead, it has applied the standard minimum contacts analysis, focusing on the defendant's alleged activities in the forum state." *Crownover v. Crownover*, No. DR-15-CV-132-AM, 2016 WL 11522978, at *10 (W.D. Tex. Sept. 20, 2016) (citing *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 221 (5th Cir. 2012)). The analysis hinges on whether plaintiff "establish[es] that the Defendant, in her individual capacity, purposefully availed herself of conducting activities within Texas." *See id.*, at *11.

35.    Further, "as an alternative to [the] traditional minimum contacts analysis, personal jurisdiction may be established over an individual or corporation through a piercing-the-corporate-veil or alter-ego theory. Under that theory, a corporation and its individual alter ego are the same entity—the jurisdictional contacts of the one are the jurisdictional contacts of the other." *Massimo Motor Sports, LLC v. Shandong Odes Indus. Co., Ltd.*, No. 3:21-CV-2180-X, 2024 WL 1895086,

---

[8] *See* SPIKE'S TACTICAL, *Find A Dealer,* https://www.spikestactical.com/find-a-dealer/ (last visited December 18, 2025).

at *1 (N.D. Tex. Apr. 30, 2024) (citing *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)).

36.     Here, Register certainly purposefully availed himself of conducting activities within Texas. Register personally negotiated the key terms of the Agreement, including the Forum Selection Clause, *see* Ex. 3, ¶ 5, and personally approved and signed the Agreement, *see* Ex. 1, p. 33. The Agreement created continuing obligations with Texas, and it led to repeated communications with DeMonico in Texas and ongoing performance tied to Texas through DeMonico. *See* Ex. 1; Ex. 3, ¶ 6. Register was not a distant executive, he personally orchestrated the Texas-centered conduct giving rise to this dispute.

37.     Further, the jurisdictional contacts of Defendant Register act as the jurisdictional contacts of Defendants Spider Hole and Spike's, and vice versa. Accordingly, Spike's and Register's extensive business in Texas[9] and Spider Hole's agreement to the Forum Selection Clause naming Texas as the intended forum state are functionally Register's own jurisdictional contacts with Texas. Accordingly, this Court has personal jurisdiction over all Defendants. As the primary participant in all Spider Hole and Spike's business dealings, Register cannot hide behind any fiduciary shield.

38.     Meanwhile, for tortious acts the Fifth Circuit has found that, "[w]hen a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor." *See McFadin v. Gerber*, 587 F.3d 753, 761 (5th Cir. 2009). "Even an act done outside the state that has consequences or effects within the

---

[9] *See id.*; *see also* Ex. 2.

state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999).

39.     Here, Defendants' tortious conduct—namely, conversion, fraud, and breach of fiduciary duty—caused tortious injury within the state of Texas by damaging Plaintiffs DeMonico, LAD, and ABC, all Texas citizens.

        **b.     This action arises out of Defendants' minimum contacts with Texas.**

40.     The second prong of the analysis is whether the plaintiffs' "cause of action arises out of or results from the defendant's forum-related contacts." *Moore v. Inst. for Wealth Advisors, Inc.*, No. 3:19-CV-2601-L-BK, 2020 WL 6576166, at *2 (N.D. Tex. Aug. 3, 2020), report and recommendation adopted, No. 3:19-CV-2601-L, 2020 WL 4877588 (N.D. Tex. Aug. 19, 2020). To satisfy this prong, the defendant's "suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). "Thus, the court must look to the defendant's conduct to see if he made contacts with the forum state itself and not just with persons who reside there." *Moore*, 2020 WL 6576166, at *2. The exercise of jurisdiction "must be based on intentional conduct" that created "the necessary contacts with the forum." *See id.* (quoting *Walden*, 571 U.S. at 286).

41.     Here, Plaintiffs' claims arise out of Defendants' purposeful contacts with Texas. As the contacts outlined above show, Defendants' contacts with Texas relate to the claims. The operative facts in this case concern Defendants' negotiation, execution, and performance of agreements with citizens of Texas in which Defendants agreed Texas had jurisdiction, and the misrepresentations made to induce that agreement. All of Plaintiffs' claims arise directly from Defendants' Texas contacts because those contacts created contractual and fiduciary obligations

that Defendants later breached. Further, Defendants' extensive contacts with Texas via their extensive business in the state also demonstrate that Defendants made contacts with Texas itself.[10]

### c. Exercise of personal jurisdiction over Defendants is fair and reasonable.

42.     The third and final prong asks "whether the exercise of personal jurisdiction is fair and reasonable." *See id.* "The burden of proof shifts to the defendant to show that the exercise of personal jurisdiction is unfair or unreasonable based on five factors: (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006) (internal quotation omitted).

43.     Here, Defendants have entirely failed to meet their burden. Defendants do not make any arguments addressing the element of fairness or reasonableness in their Motion to Dismiss. *See* Dkt. No. 5, Section III. Instead, fairness and reasonableness factors weigh in favor of personal jurisdiction in this Court. Defendants purposefully and extensively engaged in interstate commerce and cannot plausibly claim undue burden from litigating in Texas. Travel, electronic discovery, and remote proceedings also substantially reduce any hardship. Having deliberately profited from Texas commerce, Defendants cannot now characterize Texas litigation as unfair. Texas has a strong interest in providing a forum for its residents and businesses harmed by out-of-state actors, particularly when the injury was felt in Texas, as is the case here. That interest is heightened where Defendants' conduct was intentionally directed at a Texas business like LAD.

---

[10] *See* SPIKE'S TACTICAL, *Find A Dealer,* https://www.spikestactical.com/find-a-dealer/ (last visited December 18, 2025); Ex. 2.

44.     In addition, requiring Plaintiff to litigate in a foreign forum would impose substantial expense and inefficiency, particularly where key witnesses, records, and damages are centered in Texas. Texas is the most efficient forum because much of the operative facts, evidence, and witnesses are concentrated here, and the dispute arises from a Texas-centered commercial relationship between the parties. Litigating in Texas avoids piecemeal litigation and inconsistent judgments between the many parties in this case. Finally, exercising jurisdiction here advances the shared interests of the states in enforcing contractual obligations and deterring misconduct intentionally directed across state lines.

**D.      Venue Is Proper in This Court.**

45.     "A civil action may be brought in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated[.]" 28 U.S.C. § 1391(b)(2).

46.     Further, Defendants concede that venue is proper based upon a forum selection clause "if the claims fall within the scope of the forum selection clause and all parties are bound by it." Dkt. No. 5, p. 7 (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

47.     Once a defendant challenges venue, the plaintiff has the burden of demonstrating venue is proper. *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 396 (S.D. Tex. 2011). On a motion to dismiss for improper venue, "the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 Fed. Appx. 612, 615 (5th Cir. 2007) (per curiam). "Thus, a plaintiff may show that venue is proper by 'setting forth facts that taken as true would establish venue.'" *Zurich Am. Ins. Co. v. Tejas Concrete & Materials Inc.*, 982 F. Supp. 2d 714, 719–20 (W.D. Tex. 2013) (quoting *Bigham v. Envirocare of Utah, Inc.*, 123 F.Supp.2d 1046, 1048 (S.D. Tex. 2000)).

48.     Here, Venue is proper in this Court under (1) the Agreement and (2) 28 U.S.C. § 1391(b)(2). First, venue is proper here under the Forum Selection Clause, as the clause specifically mandates that any dispute under or in connection with the Agreement be brought in federal or state Texas court. While neither Defendant Spike's nor Register signed the agreement, they are, as set out above, subject to the Agreement's forum clause because they are so closely related to Spider Hole and the dispute. Second, due to DeMonico's residence in Austin, Texas, and LAD and ABC's subsequent Texas citizenship, a substantial portion of the events or omissions in this case occurred in Texas.

**E.     Neither Rule 41(a)(1)(B) Nor Rule 41(b) Applies Here.**

49.     The Fifth Circuit has found that, "[u]nder [its] precedent, dismissals based on jurisdictional issues must, by their very nature, be without prejudice." *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023), cert. denied, 144 S. Ct. 188, 207 n. 3 (2023). A rare exception is Federal Rule of Civil Procedure 41(a)(1), which applies only to voluntary dismissals initiated by the plaintiff in a cause of action. *See* FED. R. CIV. P. 41(a)(1). Under Rule 41(a)(1)(B), a plaintiff's notice of voluntary dismissal operates as an adjudication on the merits and not merely as a dismissal without prejudice when filed by a plaintiff who has already dismissed the same claim in another court. *Id.* at 41(a)(1)(B). That is, if a plaintiff files **two** voluntary dismissals of the same claim, then the plaintiff's **second** notice of dismissal acts as an adjudication on the merits. *See id.*

50.     Here, Defendants severely misapply Rule 41(a)(1)(B) in their Motion to Dismiss. Defendants claim that Plaintiffs' mere act of filing a new case after dismissing a previous case— notably, a case with different plaintiffs listed—"operates as an adjudication on the merits[.]" *See* Dkt. No. 5, p. 8. First, a plaintiff's filing of a case by definition cannot operate as an "adjudication on the merits" as Defendants argue. *See* Dkt. No. 5, p. 8. Black's Law Dictionary defines an "adjudication" as a "judgment." *See Adjudication*, BLACK'S LAW DICTIONARY (12th ed. 2024).

That is, an "adjudication on the merits" refers to the court's final judgment on a matter. Second, the Rule does not and cannot apply here because the Rule only applies to a plaintiff's **second** filing of a dismissal. *See* FED. R. CIV. P. 41(a)(1)(B). Defendants admit there is only one voluntarily dismissed case—again, a case involving a different set of plaintiffs—that they allege involves the same claims as the present suit. *See* Dkt. No. 5, p. 8. Third, Plaintiffs maintain that, since Plaintiff ABC was not party to the first suit to which Defendants refer, the present suit is not a suit on the same claim and, thus, the Rule cannot apply.

51.     In addition, under Rule 41(d), "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied." FED. R. CIV. P. 41(a)(1). "Fee awards are permitted under Rule 41(d) only if the underlying statute defines 'costs' to include fees." *Portillo v. Cunningham*, 872 F.3d 728, 739 (5th Cir. 2017).

52.     Here, the Plaintiffs in this case are not the same set of plaintiffs who filed a previous lawsuit against Defendants and, thus, Rule 41(d) does not apply. However, should the court find Rule 41(d) applies, any costs awarded must not include attorney's fees unless the cause of action has an underlying statute that defines costs to include such fees.

## IV.     **PRAYER**

WHEREFORE, Plaintiffs respectfully request this Court deny Defendants' Motion to Dismiss.

Dated:  December 23, 2025

Respectfully submitted,

*/s/ Jared Greathouse*
Jared A. Greathouse
Texas State Bar No. 24077284
Robert A. Rhodes
Texas State Bar No. 24116958
**MUNSCH HARDT KOPF & HARR, PC.**
1717 West 6th Street, Suite 250
Austin, Texas 78703
Telephone: 512.391.6100
Facsimile: 512.391.6149
Email: jgreathouse@munsch.com
Email: rrhodes@munsch.com

**ATTORNEY FOR PLAINTIFFS ABC
IP, INC, LAD, LLC, AND LAWRENCE
DEMONICO**

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system.

*/s/ Jared Greathouse*

# **<u>EXHIBIT 1</u>**

## Operating Agreement of ABC IP, LLC

## A Delaware Limited Liability Company

By this OPERATING AGREEMENT (the "**Agreement**"), made and entered into on September 17, 2024, however the parties agree that the terms of this agreement shall be effective as of December 02, 2020 replacing and superseding all previous agreements. All rights, obligations, and responsibilities set forth herein shall be deemed to have commenced as of the effective date, notwithstanding the later execution date. Those persons and entities whose names, addresses and signatures are set forth below, being the Members of ABC IP, LLC (the "**Company**"), hereby represent and agree that they have filed, on behalf of the Company, Articles of Organization with the Secretary of State for the State of Delaware, and that they desire to enter into an operating agreement in accordance with the Act (as defined below) in order to establish their respective rights and obligations in connection with forming the Company.

NOW, THEREFORE, in consideration of the mutual covenants and provisions contained in this Agreement, the Members agree as follows:

## ARTICLE I.
## DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

**1.1**.

"**Act**" means the Delaware Limited Liability Act, as amended from time-to-time.

"**Affiliate of a Member or Manager**" means any Person under the control of, in common control with, or in control of a Member or Manager, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited-liability company, the ability to exercise more than fifty percent (50%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

"**Agreement**" means this Operating Agreement, in its original form and as amended from time-to-time.

"**Articles**" means the Articles of Organization filed with the Delaware Secretary of State forming this limited liability company, as initially filed and as they may be amended from time-to-time.

**EXHIBIT A**

"**Bankruptcy**" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

"**Capital Account**" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as (1) increased by any additional contributions and the Member's share of the Company's profits; and (2) decreased by any distribution to that Member as well as that Member's share of Company losses.

"**Capital Contribution**" means the total amount of money and the fair market value, net of liabilities, of any property contributed by the Members to the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended from time-to-time, or any corresponding provision of any succeeding revenue law.

"**Company**" means ABC IP, LLC, the entity formed in accordance with this Agreement and the Articles.

"**Company Minimum Gain**" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d).  [26 C.F.R. § 1.704-2(d)].

"**Corporations Code**" means the Delaware Corporations Code, as amended from time-to-time and the provisions of any succeeding law.

"**Departing Member**" means any Member whose conduct results in a Dissolution Event or who withdraws from the Company in accordance with Section 4.3, where such withdrawal does not result in dissolution of the Company.

"**Dissolution Event**" means, with respect to any Member, one or more of the following: the death, resignation, retirement, expulsion, bankruptcy, or dissolution of any Member.

"**Distribution**" means the transfer of money or property by the Company to the Members without consideration.

"**Fiscal Year**" means the Company's fiscal year, which shall be the calendar year.

**EXHIBIT A**

"**Founder Purchase Value**" means a repurchase price calculated by the number of years the Founding Member has been a member in the Company, multiplied by $50,000. For example, if the Founding Member has been a member for two and a half years, their Founder Repurchase Value would be $125,000.

"**Founding Member**" means LAD, LLC; An 1861, LLC; LeLeux, LLC; and Spider Hole, LLC or their authorized assignee. No other member, unless otherwise provided herein, who becomes a member after the execution of this Agreement shall be considered a Founding Member.

"**Majority Interest**" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

"**Manager**" means the Person or Persons designated as such in ARTICLE V.

"**Member**" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

"**Member Nonrecourse Debt**" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations Section 1.704-2(b)(4). [26 C.F.R. § 1.704-2(b)(4)].

"**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Code Section 705(a)(2)(B) [26 U.S.C.A. § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

"**Membership Interest**" means a Member's rights in the Company, collectively, including the Member's economic interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the Act.

"**Negative Capital Account**" means a Capital account with a balance of less than zero.

"**Net Profits**" and "**Net Losses**" mean the Company's income, loss, and deductions computed at the close of each fiscal year in accordance with the accounting methods used to prepare the Company's information tax return filed for federal income tax purposes.

ABC IP, LLC
*Operating Agreement*

Page 3 of 34

**EXHIBIT A**

**"Nonrecourse Liability"** has the meaning provided in the Regulations Section 1.752-1(a)(2). [26 C.F.R. § 1.752-1(a)(2)].

**"Partnership Representative"**, as defined in Code Section 6223(a) [26 U.S.C.A. § 6223(a)], is that Person designated by the Company in Section 8.6 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

**"Percentage Interest"** means the percentage ownership of the Company of each Member as set forth in the column entitled "Member's Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time-to-time pursuant to this Agreement.

**"Person"** means an individual, partnership, limited partnership, corporation, limited-liability company, registered limited liability partnership, trust, association, estate, or any other entity.

**"Positive Capital Account"** means a Capital Account with a balance greater than zero.

**"Regulations"** as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations which may be promulgated.

**"Remaining Members"** means, upon the occurrence of a Dissolution Event, those Members of the Company whose conduct did not cause its occurrence.

**"Secretary of State"** means the Secretary of State for the State of Delaware.

**"Timely"** unless otherwise provided herein, shall be within two weeks of the request being made.

## ARTICLE II.
## FORMATION AND ORGANIZATION

**2.1. Initial Date and Initial Parties.**

This Agreement entered into on September 18, 2024, superseding the prior organizational documents filed on or about December 2, 2020, by and among the Company and the Persons who are Members of the Company on that date.

ABC IP, LLC
*Operating Agreement*

Page 4 of 34

**EXHIBIT A**

## 2.2. Subsequent Parties.

No Person may become a Member of the Company without agreeing to and without becoming a signatory of this Agreement, and any offer or assignment of a Membership interest is contingent upon the fulfillment of this condition.

## 2.3. Name.

The name of this Company is ABC IP, LLC.

## 2.4. Term.

The Company commenced upon the filing of its Articles and it shall continue in existence until terminated earlier under the provisions of the Act or Section 9.1 of this Agreement.

## 2.5. Principal Place of Business.

The Company will have its principal place of business at 8 The Green, Suite A, Dover, DE 19901, or at any other address upon which the Managers agree. The Company shall maintain its principal executive offices at its principal place of business, as well as all records and documents which it is required to keep by the Act.

## 2.6. Names and Addresses of Members and Managers.

The name, present mailing address, taxpayer identification number, and percentage ownership of each Member is listed on Exhibit "A" attached hereto. The name and present mailing address of each Manager is also listed in Exhibit A.

## 2.7. Authorization and Purpose.

Pursuant to the Act, the Members have formed this Company and, in accordance therewith, have filed Articles of Organization with the Secretary of State. The Members intend to govern the Company in accordance with the Act, the Articles, and this Agreement and to have their rights and liabilities in connection with the Company to be so determined. In the event of any conflict between the Act and the Articles and Agreement, this Agreement will control, to the extent permitted by the Act.

The purpose of the Company is to engage in any lawful business activity that is permitted by the Act.

**EXHIBIT A**

# ARTICLE III.
## CAPITAL CONTRIBUTIONS AND ACCOUNTS

### 3.1. Initial Capital Contributions.

The initial Capital Contribution of each Member is listed in Exhibit A attached hereto. Exhibit A shall be revised to reflect any additional contributions pursuant to Section 3.2.

### 3.2. Additional Contributions.

Only Spider Hole, LLC shall be responsible for providing additional capital as deemed necessary by the Managers. Upon agreement by the majority of the Managers Spider Hole, LLC shall be required to contribute additional capital to the Company. Upon receipt of such additional contributions, Spider Hole, LLC's capital account shall be adjusted accordingly.

### 3.3. Interest Payments.

No Member shall be entitled to receive interest payments in connection with any contribution of capital to the Company.

### 3.4. Right to Return of Contributions.

No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement in ARTICLE IX.

### 3.5. Capital Accounts.

A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations Section 1.704-1(b)(2)(iv) [26 C.F.R. § 1.704-1(b)(2)(iv)], which shall reflect all Capital Contributions to the Company. Should any Member transfer or assign all or any part of his or her membership interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

### 3.6. Failure of Member to Make Contribution.

Spider Hole, LLC shall make timely payment to the Company of required Capital Contributions. The failure to make such a contribution will render Spider Hole, LLC in default under this Agreement. If a default occurs, the Managers will give the defaulting Member written notice that the default must be cured within fifteen (15) days from the date that such notice is mailed. If the defaulting Member fails to make the required Capital Contribution to the Company within the fifteen (15)-day period, the Managers may, at their sole discretion, elect to take any of the following actions:

(a) The non-defaulting Members may elect to dissolve the Company, in which case the Company shall be duly liquidated and wound up in accordance with ARTICLE IX;

ABC IP, LLC
*Operating Agreement*

Page 6 of 34

**EXHIBIT A**

(b) The Company or the non-defaulting Members may purchase the defaulting Member's interest for the Founder Repurchase Value;

(c) The defaulting Member shall forfeit his or her voting and approval rights under this Agreement, the Articles, and the Act, until the default is cured;

(d) The defaulting Member shall lose his or her right to receive distributions until the non-defaulting Members who advance funds to the Company shall be repaid those monies as well as a cumulative, non-compounded return thereon at the rate ten percent (10%) per annum; or

(e) The defaulting Member shall lose the ability to participate, whether as Member or Manager, in the management and affairs of the Company, until the default is cured.

Election by the Managers to pursue any of the foregoing remedies shall not be deemed a waiver of or limitation on the right to pursue any other remedy available under this Agreement or at law or equity in the event of a subsequent default.

Each Member agrees that: (1) the Company and the non-defaulting Members shall incur certain costs, obligations, and damages in the event of a default by any Member, which shall be extremely difficult to ascertain; (2) the remedies described in this Section 3.6 bear a reasonable relationship to the damages that may be suffered in the event that any Member defaults in his or her obligation to make the required Capital Contribution to the Company; and (3) election of any of the foregoing remedies would not be unreasonable based on the facts and circumstances existing as of the date that this Agreement is executed.

## ARTICLE IV.
## MEMBERS

### 4.1. Limitation of Liability.

No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his or her Membership in the Company, except as expressly set forth in this Agreement or required by law.

### 4.2. Additional Members.

The Managers may admit additional Members to the Company only if approved by a Majority Interest of the Members. Additional Members shall be permitted to participate in management at the discretion of the Managers upon agreement by the existing Members. Likewise, the Managers shall determine and the existing Members shall agree upon an Additional Member's participation in "Net Profits," "Net Losses," and distributions, as those terms are defined in ARTICLE I. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and percentage ownership of any Additional Members.

ABC IP, LLC                                                                                    Page 7 of 34
*Operating Agreement*

**EXHIBIT A**

### 4.3. Withdrawal from Membership.

Any Member who is under an obligation to render services to the Company may withdraw at any time after sixty (60) days' written notice to the Company, without prejudice to the rights of the Company or any Member under any contract to which the withdrawing Member is a party. Such withdrawing Member shall have the rights of a transferee under ARTICLE VII and the remaining Members shall be entitled to purchase the withdrawing Member's Membership interest in accordance with Section 7.3. In the event of such a withdrawal, Exhibit A shall be amended to reflect the change in ownership interests. No other Members are permitted to withdraw from the Company.

### 4.4 Active Participation

Each Member of the Company is required to actively participate in the management, operations, and business activities of the Company. Active participation shall be defined as:
   a) Regularly attending and contributing to meetings and discussions concerning the Company's business;
   b) Participating in decision-making processes;
   c) Fulfilling any roles or responsibilities assigned to the Member by the Company; and
   d) Engaging in activities that further the Company's business interests as reasonably determined by the Managing Members or the Board of Directors.

The Managers shall have the authority to set specific expectations and metrics for active participation, which may be documented in writing and provided to the Members.

If a Member fails to actively participate for a continuous period of 3 months for a reason not related to health or some other issue outside of their control, the participating Members shall have the right to purchase the membership interest of the non-participating Member for the Founder Repurchase Value.

### 4.5. Competing Activities.

The Members and their officers, directors, shareholders, partners, managers, agents, employees and Affiliates are permitted to participate in other business activities which may be in competition, direct or indirect, with those of the Company. The Members further acknowledge that they are under no obligation to present to the Company any business or investment opportunities, even if the opportunities are of such a character as to be appropriate for the Company's undertaking. Each Member hereby waives the right to any claim against any other Member or Affiliate on account of such competing activities. Provided, however, that the provisions of Section 4.4 do not apply to Members who are Managers of the Company.

### 4.6. Compensation of Members.

No Member or Affiliate shall be entitled to compensation for services rendered to the Company, absent agreement by the Members. However, Members and Affiliates shall be entitled to reimbursement for the actual cost of goods and services provided to the Company, including, without limitation, reimbursement for any professional services required to form the

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

Company.

## 4.7. Transactions with the Company.

The Managers may permit a Member to lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the Act. To the extent permitted by applicable laws, such a Member shall be treated like any other Person with respect to transactions with the Company.

## 4.8. Members Are Not Agents.

Each of the Members of the Company has agreed to delegate the management of the Company to the Managers and, accordingly, expressly relinquishes any rights he or she might otherwise have to act on behalf of the Company, to incur liability on behalf of the Company or to bind the Company in any way. Unless authorized by the Act, this Agreement or the Managers, Members shall not act as agents of the Company.

## 4.9. Meetings.

(a) There will be no regular or annual meetings of the Members. However, any Manager or Members with an aggregate Percentage Interest of ten percent (10%) or more may call a meeting of the Members at any time. Such meeting shall be held at a place to be agreed upon by the Managers or, if no agreement can be reached, at the Company's principal executive office. The meeting shall be held during normal business hours.

(b) The Managers shall appoint one Member to preside at the meeting and another Member to act as secretary. The secretary shall prepare minutes of the events transpiring at the meeting, which shall be maintained along with the books and records indicated in Section 8.1 at the Company's principal place of business.

(c) If any action on the part of the Members is to be proposed at the Meeting, then written notice of the meeting must be provided to each Member entitled to vote not less than three (3) days or more than sixty (60) days prior to the meeting. Notice may be given in person, by first-class mail, email or other written communication (not including text messages), charges prepaid, addressed to each Member at the address listed for that Member in Exhibit A. Notice shall be deemed complete upon personal delivery, transmission of the facsimile or telegram, or when deposited in the mail or sent in writing in some other manner. The notice shall contain the date, time, and place of the meeting and a statement of the general nature of the business to be transacted there. Matters which are not contained in the notice may not be addressed at the meeting.

(d) Any Member entitled to call a meeting may request in writing that any Manager provide the aforementioned notice to all Members entitled to vote at the meeting. If the written notice is not given by the Manager within twenty (20) days of the request, the Member may then give notice of the meeting.

(e) An affidavit of the mailing of notice shall be prepared by the Manager, Member, or other employee of the Company that actually causes written notice of the meeting to be

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

transmitted to the Members.  The affidavit shall be maintained at the Company's principal place of business, along with the books and records listed in Section 8.1.

**4.10**. **Actions at Meetings.**

(a) No action may be taken at a meeting that was not proposed in the notice of the meeting, unless there is unanimous consent among all Members entitled to vote.

(b) No action may be taken at a meeting unless a quorum of Members is present, either in person or by proxy.  A quorum of Members shall consist of Members holding a majority of the Percentage Interest in the Company.  Once a quorum has been established at a duly held meeting, business may be regularly transacted at that meeting without adjournment, notwithstanding that the quorum is no longer present, so long as Members holding a majority of the Percentage Interest in the Company approve any action taken.

(c) A Member may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Members are able to hear each other. A Member participating in accordance with the preceding sentence shall be deemed present at the meeting.

(d) Any meeting may be adjourned upon the vote of the majority of the Membership Interests represented at the meeting.  A quorum of Members need not be present to conduct the vote.  If a duly held meeting is adjourned to another time and place, no notice of the time and place of the adjourned meeting is required, if there is an announcement at the time of the adjournment of when and where the meeting is to be resumed and it is resumed within forty-five (45) days of adjournment.  Notice in accordance with the provisions of Section 4.9(c) is required if a new record date for the meeting is subsequently set or if the adjournment is for a period in excess of forty-five (45) days from the date of the original meeting, in which case the Managers shall set a new record date.  Any business which could have been transacted at the original meeting may be transacted at the adjourned meeting.

(e) Actions taken at any meeting of the Members, regardless of where it is held or whether it is noticed and conducted in accordance with the foregoing rules, have the same force and validity as actions taken at a duly noticed and held meeting, if there is a quorum present in person or by proxy, and if, either before or after the meeting, each Member who was entitled to vote at the meeting but who was not present in person or by proxy, signs a written waiver of notice, consent to the holding of the meeting, or approval of the minutes of the meeting.  A written waiver of notice need not contain a statement of the purpose of the meeting or the business to be transacted, except if it is to be given in support of an action taken at a meeting which was not stated in the notice.  All such written waivers, consents, or approvals shall become part of the records of the Company and shall be maintained at the Company's principal place of business along with the books and records listed in Section 8.1.

(f) Any Member who attends a meeting shall be deemed to have waived his or her right to object to the notice of the meeting, unless the Member expresses such an objection at the commencement of the meeting.  Attendance at a meeting shall not constitute a waiver of the right to object to the transaction of any business which was not disclosed in the notice of the meeting, so long as the objection is asserted at the meeting.

(g) Members who are entitled to vote at a meeting may do so in person or by authorizing another Person or Persons to act as proxy.  The proxy must be in writing, executed by the

ABC IP, LLC
*Operating Agreement*

Page 10 of 34

**EXHIBIT A**

Member authorizing it, and it must be filed with the Managers or secretary, if any, of the Company. A proxy will be deemed executed if the Member's name is placed on the proxy, whether manually, typed, electronically transmitted or otherwise, by the Member or his or her attorney in fact. If the proxy does not state on its face that it is irrevocable, it shall continue in full force and effect unless either (1) the Member who issued the proxy revokes it prior to the vote pursuant to the proxy by (A) delivering written notice to the Company that the proxy is revoked, (B) issuing a subsequent proxy, or (C) attending the meeting and voting in person; or (2) the Company is notified of the death or incapacity of the Member who authorized the proxy, before the vote pursuant to the proxy is counted. Notwithstanding the foregoing, no proxy shall remain in effect for more than eleven (11) months, unless the face of the proxy indicates a longer term. The revocability of any proxy which states on its face that it is irrevocable will be determined in accordance with the applicable provisions of the Corporations Code.

**4.11**. **Actions Without Meetings.**

Any action that may be taken at a meeting of the Members may be taken without a meeting and without prior notice, if written consents to the action are submitted to the Company within sixty (60) days of the record date for the taking of the action, executed by Members holding a sufficient number of votes to authorize the taking of the action at a meeting at which all Members entitled to vote thereon are present and vote. All such consents shall be submitted to the Managers or the secretary, if any, and shall be maintained as a part of the Company's records. Any Member who signs such a written consent, or the Member's proxy holders, may revoke the consent by submitting a written revocation to the Managers or secretary which is received prior to the filing with the Company of a sufficient number of written consents to authorize the taking of the action. Unless written solicitations of consent have been circulated to all Members entitled to vote: (1) notice of any action taken pursuant to submission of written consents shall immediately be given to any Member who did not submit a written consent; and (2) if the action to be taken is the dissolution or merger of the Company, such action shall not be consummated until at least ten (10) days after notice is received by each Member who has not consented in writing to the action.

**4.12**. **Record Date.**

To enable the Company to determine the Members entitled to receive notice of any meeting, to vote, to receive distributions, to exercise any rights with regard to distributions, or to exercise any other lawful right granted by this Agreement, the Articles, or the Act, the Managers or Members representing in excess of ten percent (10%) of the Percentage Interests in the Company may fix, in advance, a record date that is not more than sixty (60) or less than ten (10) days prior to the date of such meeting or more than sixty (60) days prior to any other action. If no record date is fixed, the record date shall be determined in accordance with the Act.

**4.13**. **Voting Rights.**

Except as expressly provided in the Articles or in this Agreement, Members shall have no voting, approval, or consent rights. Members shall have the right to approve or disapprove matters as stated in the Articles and in this Agreement, including, without limitation, the following actions:

ABC IP, LLC                                                                 Page 11 of 34
*Operating Agreement*

**EXHIBIT A**

(a) The following actions shall require the unanimous vote, approval, or consent of all Members who are neither the subjects of a dissolution event nor the transferors of a Membership Interest:

(1) approval of the purchase by the Company or its nominee of the Membership Interest of a transferor Member in accordance with Section 7.3;

(2) approval of the sale, transfer, exchange, assignment, or other disposition of a Member's interest in the Company, and admission of the transferee as a Member pursuant to Section 7.1;

(3) a decision to make any amendment to the Articles or to this Agreement, in accordance with Section 11.13; and

(4) a decision to compromise the obligation of any Member to make a Capital Contribution or return money or property distributed in violation of the Act.

(b) Except as set forth in Section 5.4, all other matters requiring the vote, approval, or consent of the Members may be authorized upon the vote, approval, or consent of those Members holding a majority of the Percentage Interests in the Company.

(c) In the event that any Member shall abstain from a vote taken by the membership of the Company, such abstention shall not serve to block the remaining members from reaching a unanimous or majority decision on the issue presented. Specifically, all matters shall be deemed ratified by either the majority or unanimous (as applicable) vote of the voting members, not merely the members entitled to vote.

### 4.14. Removal of Members.

(a)     Grounds For Removal

A Member may be removed from the Company upon the unanimous consent of all other Members for any of the following reasons:

(i) Breach of any material provision of this Operating Agreement;

(ii) Breach of fiduciary duties owed to the Company or its Members;

(iii) Engaging in illegal, fraudulent, or unethical conduct that materially and adversely affects the business or reputation of the Company;

(iv) Financial misconduct, including but not limited to embezzlement, misappropriation of Company funds, or misuse of Company assets;

(v) Failure to perform duties as required by this Operating Agreement or as reasonably expected by the other Members including, but not limited to, meeting all capital contribution requirements and participating in the management of the Company;

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

(vi) Prolonged absence or incapacity preventing the Member from fulfilling their obligations to the Company; or

(b)      Procedure for Removal

(i) A meeting of the Members shall be called to discuss the proposed removal of the Member. The Member subject to potential removal shall be given at least ten (10) business days' notice of the meeting and the reasons for the proposed removal.

(ii) At the meeting, the Member subject to removal shall have the opportunity to present their case and respond to the reasons for the proposed removal.

(iii) Following the discussion, a vote shall be taken. The Member subject to removal shall not have voting rights on their own removal. The unanimous consent of all remaining Members is required to remove the Member.

(iv) If the required unanimous consent is obtained, the Member shall be deemed removed from the Company effective immediately, and the removed Member shall no longer have any rights or obligations as a Member of the Company, except as otherwise provided in this Operating Agreement or under applicable law.

(v)      Upon the occurrence of a vote to remove a Member pursuant to this Section, the removed member shall be paid the Founder Repurchase Value in exchange for their membership interest.

**(c) Effect of Removal**

(i) The removed Member shall cooperate in executing any necessary documents to effectuate their removal and the transfer of their interest in the Company.

(ii) The removed Member shall continue to be bound by the confidentiality and non-compete provisions of this Operating Agreement, if any, for the duration specified therein.

**ARTICLE V.**
**MANAGEMENT**

**5.1**. **Exclusive Management.**

The Company shall be managed by the Managers.  The Managers shall have exclusive authority, discretion, power, and control to manage the property, business and affairs of the Company, and to make all decisions and perform all services incident to the management thereof, except as otherwise provided in this Agreement or the Act.

**5.2**. **Time Commitments.**

The Managers shall devote the time, effort, and skill that they reasonably believe is

ABC IP, LLC                                                                                      Page 13 of 34
*Operating Agreement*

**EXHIBIT A**

necessary to conduct the affairs of the Company and to attend to all matters concomitant to the business of the Company. The Managers are not required to devote all of their time or efforts to the operation of the Company.

**5.3. Management Powers.**

Subject to the express limitations contained in Section 5.4 and elsewhere in this Agreement or in the Articles, the Managers shall have all powers necessary to carry out the purposes of and to manage the business, property, and affairs of the Company, including, without limitation, the powers enumerated in the Act, including the power to:

(a) acquire, purchase, alter, renovate, improve, demolish, rebuild, replace, and hold real property and any other property or assets or to acquire options to purchase such property or assets, wherever located, that the Managers determine to be in the furtherance of the Company's business or in the best interests of the Company;

(b) make contracts and guarantees, incur liabilities, act as surety, borrow money, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of, and extend the time for payment of any indebtedness or obligation of the Company; and secure such indebtedness with a lien on Company assets, such as a mortgage, deed of trust, pledge, or security interest;

(c) sell, lease, exchange, transfer, convey, mortgage, pledge, and otherwise dispose of all or any part of the Company's property and assets, or any interest therein;

(d) lend money to the Company and otherwise assist its members and employees;

(e) purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of and otherwise use and deal in and with stock or other interests in and obligations of any person, or direct or indirect obligations of the United States or of any government, state, territory, governmental district, or municipality, or of any instrumentality of any of them;

(f) be a promoter, stockholder, partner, member, manager, associate, or agent of any person;

(g) indemnify or hold harmless any person or guarantee the payment of money or the performance of any contract or obligation of any person;

(h) sue on, defend, or compromise any claim or liability in favor of or against the Company or submit any such claim to arbitration or other alternative means of dispute resolution or confess a judgment against the Company in connection with any litigation with which the Company is involved; and

(i) retain auditors, legal counsel, and such other professional services as the Company may require and determine the appropriate compensation for the same.

**5.4. Limitations on Powers.**

The Managers shall not be authorized to permit the Company to perform the following acts or to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest or such greater Percentage Interest as

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

may be indicated below:

(a) the sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a part of a single transaction or a series of transactions over a 12-month period, except if the same is part of the orderly liquidation and winding up of the Company's affairs upon the duly authorized dissolution of the Company, shall require the affirmative vote or written consent of Members holding at least 55% of the Percentage Interests in the Company;

(b) the merger of the Company with another limited liability company or limited partnership shall require the affirmative vote or the written consent of Members holding at least 55% of the Percentage Interests in the Company, provided that no Member may be required to become a general partner in the merged entity absent his or her express written consent thereto;

(c) the merger of the Company with a corporation, a general partnership, or other Person shall require the affirmative vote or written consent of all Members;

(d) any alteration of the primary purpose or business of the Company as set forth in Section 2.8 shall require the affirmative vote or written consent of Members holding at least 55%% of the Percentage Interests in the Company;

(e) the establishment of different classes of Members;

(f) without limiting subsection (f) of this section, the lending of money to any Member, Manager, or Affiliate of either;

(g) any act which would prevent the Company from conducting its duly authorized business;

(h) the confession of a judgment against the Company;

(i) the filing of a petition under Title 11 of the United States Code on behalf of the Company; and

(j) any other act or transaction for which the consent of the Members is required, either in this Agreement or under the Act.

Notwithstanding any other provision of this Agreement, the written consent of all of the Managers is required to permit the Company to incur an indebtedness or obligation greater than $100,000. All checks, drafts, or other instruments requiring the Company to make payment of an amount less than $100,000 may be signed by any Manager, acting alone. Any check, draft, or other instrument requiring the Company to make payment in the amount of $100,000 or more shall require the signatures of 2 Managers acting together. Any Manager, acting alone, may endorse checks, drafts, or other evidence of indebtedness to the Company, but only for deposit into one of the Company's accounts.

**5.5**. **Meetings.**

Any Manager or officer may call a meeting of the Managers upon four (4) days' notice by mail or forty-eight (48) hours' notice delivered personally, by email, or telephone. The notice need not indicate the purpose for which the meeting is called.

ABC IP, LLC                                                                                    Page 15 of 34
*Operating Agreement*

(a) Notice of a meeting need not be given to any Manager who executes a waiver of notice or a consent to the holding of the meeting, whether before or after the meeting, or who attends the meeting without objecting to the lack of notice prior to the commencement thereof or who approves the minutes of the meeting. All such waivers, consents, or approvals shall be filed with the Company and be made a part of the minutes of the meeting, but they need not indicate the purpose for which the meeting was called.

(b) A majority of the Managers present at the meeting, whether or not they constitute a quorum, may adjourn any meeting to another time and place. If the adjournment is for a period greater than twenty-four (24) hours, notice of the adjourned time and place shall be given prior to the time of the adjourned meeting to any Manager who was not present when the meeting was adjourned.

(c) Meetings of the Managers may be held at any place specified in the notice of the meeting, whether within or without the State of Delaware. If the notice does not designate a meeting place, then the meeting shall be held at any place agreed upon by the Managers or at the principal executive office of the Company.

(d) A Manager may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Managers are able to hear each other. A Manager participating in accordance with the preceding sentence shall be deemed present at the meeting.

(e) A majority of the authorized number of Managers constitutes a quorum of Managers for the transaction of business. Unless the Articles or this Agreement expressly require the approval of all Managers, every act performed or decision made by a majority of the Managers present at a duly held meeting, at which a quorum is present, is the act or decision of the Managers. The Managers may continue to transact business at a meeting at which a quorum was initially present, notwithstanding that one or more Managers depart, as long as any action taken is approved by at least a majority of the required quorum for the meeting.

(f) The decision to have a meeting is solely that of the Managers. The provisions of this Section 5.5 govern the procedures for conducting a meeting, should the managers, in their sole discretion, elect to hold a meeting. Nothing in this Section 5.5 is intended to create a requirement that meetings be held, as the Members expressly intend that meetings of the Managers are not required.

**5.6**. **Actions Without Meetings.**

Any action required or permitted to be taken by the Managers may be taken without a meeting, if a majority of the Managers individually or collectively consent in writing to the taking of the action, except in such cases where the Articles or this Agreement require the unanimous consent of the Managers, in which case all Managers must execute written consents. Any action taken by written consent shall have the same force and effect as an action taken by a vote of the Managers.

**5.7**. **Election and Removal of Manager.**

(a) The Company shall initially have three (3) Managers, Cole LeLeux, Lawrence DeMonico, Kevin Maxwell. The Company may, from time-to-time, fix the number of Managers that it shall have, upon the affirmative vote or written consent of a Majority Interest of the

ABC IP, LLC                                                                                     Page 16 of 34
*Operating Agreement*

**EXHIBIT A**

Members.  However, the Company may not have less than one (1) Manager at any time.  Should the Members elect to increase the number of Managers or to reduce it from more than one to one, the Articles shall be amended to so indicate.

(1) Unless a Manager resigns or is removed, each Manager shall serve.

(2) The Managers shall be elected by the affirmative vote or written consent of a Majority Interest of the Members.

(3) A Manager may, but need not, be a Member.  The Managers need not be individuals, residents of the State of Delaware, or citizens of the United States.

(b) A Manager may be removed at any time, with or without cause, upon the affirmative vote of Members holding a Majority Interest at a meeting expressly called for the purpose of such a vote.  The removal shall be without prejudice to the rights, if any, of the Manager under any employment contract with the Company.  If the Manager is a Member, his or her removal shall not affect any rights he or she has as a Member, nor shall it constitute a withdrawal from Membership.

(c) A Manager may resign at any time by providing written notice to each Member and the remaining Managers.  The resignation shall be effective immediately upon receipt of the notice, unless a later time is specified in the notice. Acceptance of the resignation is not required to make it effective, unless the notice provides otherwise.  The resignation shall be without prejudice to the rights, if any, of the Company under any contract with the Manager.  If the Manager is a Member, his or her resignation shall not affect any rights he or she has as a Member, nor shall it constitute a withdrawal from Membership.

(d) A vacancy shall exist if any Manager is removed, resigns, or dies, if there is an increase in the number of authorized positions or if the Members fail to elect a sufficient number of Managers to fill the authorized positions.  If a vacancy occurs, it may be filled by the affirmative vote or written consent of Members holding a Majority Interest.

**5.8. Liability for Performance of Duties; Duty of Care.**

(a) The Managers shall perform their managerial duties in good faith, in a manner that they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in the same position would exercise in similar circumstances.  A Manager who so performs the duties of Manager shall not incur any liability to the Company by reason of being or having been a Manager of the Company.

(b) In performing their duties, the Managers shall be entitled to rely upon information, reports, opinions, or statements made by or received from the following Persons or groups, unless the Managers are in the possession of information regarding the matter in question sufficient to render such reliance unwarranted and provided that the Managers act in good faith and after a reasonable inquiry when the need therefore is indicated by the circumstances:

(1) Any officer, employee, or other agent of the Company whom the Managers reasonably believe to be trustworthy and competent regarding the matters presented;

(2) Any attorney, independent accountant, or other professional with regard to matters which the Managers reasonably believe to be within such person's area of expertise or competence; or

**EXHIBIT A**

(3) Any committee upon which the Manager does not serve, duly created in accordance with the provisions of this Agreement or the Articles, as to matters within its designated authority, which committee the Managers reasonably believe to be competent regarding the matters within the ambit of its authority.

**5.9**. **Duty of Loyalty.**

Subject to the provisions of Section 5.10, Managers owe the same duty of loyalty to the Company and the Members that a partner owes to the partnership and the partners of the partnership.

**5.10**. **Transactions Between Company and Manager.**

Any Manager or Affiliate of a Manager may engage in transactions with the Company, notwithstanding that such transactions may constitute a conflict of interest, as long as the transaction is not expressly prohibited by this Agreement or the Act and both of the following conditions are met:

(a) The terms and conditions of the transaction are fair and reasonable to the Company and are at least as favorable as those that are generally available from Persons capable of providing the same or similar services and those between parties operating at arms length; and

(b) A majority of the Members having no interest in the transaction (other than their interest as Members) consummating the transaction.

**5.11**. **Compensation.**

Unless otherwise provided in this Agreement, no Manager or Affiliate of a Manager is entitled to compensation for services performed for or goods provided to the Company.

(a) The Company shall reimburse the Managers for the actual costs of goods used by or on behalf of the Company. Any Manager who incurs expenses for professional services required in connection with the formation of the Company and preparation of appropriate documentation shall be reimbursed for such expenses.

(b) The Company shall not provide reimbursement for the following expenses, except where permitted by this Agreement:

(1) overhead expenses of the Managers, including but not limited to rent and general office expenses;

(2) salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of a Manager or Affiliates; and

(3) the cost of providing any goods or rendering any services for which a Manager or Affiliate is entitled to compensation under this Agreement.

**5.12**. **Limitation on Exposing Members to Personal Liability.**

Neither the Company nor the Managers nor any Member may take any action which will have the effect of exposing any Member of the Company to personal liability for the obligations of the Company, without first obtaining the consent of the affected Member.

ABC IP, LLC
*Operating Agreement*

Page 18 of 34

**EXHIBIT A**

### 5.13. Limitations on Manager's Liability.

No Person who is a Manager shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager of the Company.

### 5.14. Membership Interests of Manager.

A Manager who holds a Membership Interest shall be entitled to all of the rights and privileges of a Member who is not a Manager, including without limitation the economic, voting, information, and inspection rights, unless otherwise provided in this Agreement.

### 5.15. Officers.

(a) The Managers may appoint officers, if they deem it necessary to the running of the Company. The officers shall consist of a president, secretary, and a chief financial officer. At the sole discretion of the Managers, a chairperson and vice president may also be appointed. The officers shall serve at the pleasure of the Managers, subject to all of the rights, if any, of an officer under a contract of employment. Any number of offices may be held by the same person. Officers need not be residents of the State of Delaware or citizens of the United States. The officers shall have such powers and shall perform such duties as may be determined by the Managers from time-to-time, subject to the guidelines and specifications contained in this Agreement.

(b) Subject to the rights, if any, that an officer may have under a contract of employment, an officer may be removed at any time at the pleasure of the Managers. An officer may resign at any time upon written notice to the Company, without prejudice to the rights, if any, of the Company under any contract of employment to which the officer is a party. The resignation shall be deemed effective upon receipt of the written notice, unless the notice contains a different date. Acceptance of the resignation shall not be necessary to make it effective, unless the notice specifies otherwise. Upon the removal, resignation, death, disqualification, or incapacity of any officer, the Managers may declare such office vacant and fill it in the manner prescribed for regular appointments to that office.

(c) The Managers shall fix by resolution the salaries, not to exceed $1,000,000 per person annually, of all officers and employees. The Managers are authorized to compensate officers for service provided to the Company prior to the execution of this Agreement.

(d) If the Managers appoint a chairperson, that individual shall preside at all meetings of the Members and the Managers at which he or she is present. He or she shall exercise and perform such other powers and duties as may be assigned to him or her by the Managers or prescribed by this Agreement. The chairperson may also perform the duties of the president enumerated in subsection (e), in which case he or she shall also be known as chief executive officer.

(e) The president shall be chief executive officer of the Company and shall have general and active management of the business of the Company, subject to the control of the Managers and the supervisory powers, if any, delegated by the Managers to the chairperson. The president

ABC IP, LLC                                                                 Page 19 of 34
*Operating Agreement*

**EXHIBIT A**

shall see that all orders and resolutions of the Members and the Managers are given effect and shall have the general powers and duties of management that are usually vested in the office of president of a corporation and shall have such other powers and duties as may be prescribed by the Managers or by this Agreement. The president shall have authority to execute in the name of the Company bonds, contracts, leases, mortgages, and other written instruments to be executed by the Company, except where the signing or execution thereof shall be delegated by the Managers to some other officer or agent of the Company.

(f) If the Managers appoint a vice president or vice presidents, he, she, or they shall, in the absence or disability of the president, perform the duties and exercise the powers of president and shall perform such other duties and exercise such other powers as the Managers prescribe. If more than one vice president is appointed, the Managers shall determine their order by resolution.

(g) The secretary shall attend all meetings of the Members and the Managers and shall take the minutes of the meetings. If the secretary is unable to attend, the secretary or the presiding officer at the meeting shall appoint another person to take the minutes of the meeting. The secretary shall keep or cause to be kept at the principal executive office of the Company a minute book of all meetings and actions of the Members and the Managers. The secretary shall perform the foregoing duties for any standing committees when it is required. The secretary shall give or cause to be given notice of all meetings of the Members and the Managers and shall perform such other duties as may be prescribed by the Managers. The secretary shall keep the seal of the Company, if any, in safe custody and shall have authority to affix that seal to any instrument requiring it, and, when it is so affixed, it may be attested by his or her signature.

The secretary shall keep or cause to be kept at the principal executive office or at the office of the Company's resident agent, as determined by the resolution of the Managers, a register or duplicate register, showing the names and addresses of all Members, and the Percentage Interest of each. The secretary shall also keep all documents prescribed in Section 8.1 and such other documents as may be required by the Act. The secretary shall have the general duties, powers and responsibilities of the secretary of a corporation and shall have such other powers and duties as may be conferred by the Managers or prescribed in this Agreement.

At the discretion of the Managers, an assistant secretary or assistant secretaries may be appointed to perform the duties and exercise the powers of the secretary at those times when the secretary is absent, disabled, or otherwise unable to act.

(h) The chief financial officer shall keep and maintain or cause to be kept and maintained accurate and complete books and records of accounts of all of the Company's properties and business transactions, including, without limitation, accounts of its assets, liabilities, receipts, disbursements, gains, losses, and Membership Interests. The foregoing books and records shall be open for inspection during normal business hours and at any other reasonable time for inspection by any Manager.

The chief financial officer shall keep in safe custody the funds and securities of the Company, shall keep full and accurate accounts of receipts and disbursements in the Company books, and shall deposit all monies and other valuable assets in the name of and to the credit of

ABC IP, LLC
*Operating Agreement*

Page 20 of 34

**EXHIBIT A**

the Company in such depositories as may be designated by the Managers. The chief financial officer shall disburse funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements and shall render to the president and the Managers at their meetings, or, when the Members so require, at a meeting of the Members, an account of all of his or her transactions on behalf of the Company and of the financial condition of the Company.

The chief financial officer shall perform such other duties and shall have such other authority as may be prescribed in this Agreement or by the Managers. The chief financial officer shall have the general powers, responsibilities, and duties of the chief financial officer of a corporation and shall be the chief financial and accounting officer of the Company.

The Managers may, in their sole discretion, appoint an assistant treasurer or assistant treasurers who shall perform the duties and exercise the powers of the chief financial officer in the event of his or her absence, disability, or other inability to act as chief financial officer and to perform such other duties and exercise such other authority as the Managers may determine.

## ARTICLE VI.
## ALLOCATION OF PROFIT AND LOSS

**6.1**. **Compliance with the Code and Regulations.**

The Company intends to comply with the Code and all applicable Regulations, including without limitation the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

**6.2**. **Net Profits.**

Except as specifically provided elsewhere in this Agreement, Distributions of Net Profit shall be made to Members in proportion to their Percentage Interest in the Company.

**6.3**. **Net Losses.**

Except as specifically provided elsewhere in this Agreement, Net Losses shall be allocated to the Members in proportion to their Percentage Interest in the Company. However, the foregoing will not apply to the extent that it would result in a Negative Capital Account balance for any Member equal to the Company Minimum Gain which would be realized by that Member in the event of a foreclosure of the Company's assets. Any Net Loss which is not allocated in accordance with the foregoing provision shall be allocated to other Members who are unaffected by that provision. When subsequent allocations of profit and loss are calculated, the losses reallocated pursuant to this provision shall be taken into account such that the net amount of the allocation shall be as close as possible to that which would have been allocated to each Member if the reallocation pursuant to this section had not taken place.

ABC IP, LLC
*Operating Agreement*

Page 21 of 34

**EXHIBIT A**

**6.4. Regulatory Allocations.**

Notwithstanding the provisions of Section 6.3, the following applies:

(a) Should there be a net decrease in Company Minimum Gain in any taxable year, the Managers shall specially allocate to each Member items of income and gain for that year (and, if necessary, for subsequent years) as required by the Regulations governing "minimum gain chargeback" requirements, Section 1.704-2(f) [26 C.F.R. § 1.704-2(f)] prior to making any other allocations.

(b) Should there be a net decrease in Company Minimum Gain based on a Member Nonrecourse Debt in any taxable year, the Managers shall first determine the extent of each Member's share of the Company Minimum Gain attributable to Member Nonrecourse Debt in accordance with Regulations Section 1.704-2(i)(5) [26 C.F.R. § 1.704-2(i)(5)]. The Managers shall then specially allocate items of income and gain for that year (and, if necessary, for subsequent years) in accordance with Regulations Section 1.704-2(i)(4) [26 C.F.R. § 1.704-2(i)(4)] to each Member who has a share of the Company Nonrecourse Debt Minimum Gain.

(c) The Managers shall allocate nonrecourse deductions for any taxable year to each Member in proportion to his or her Percentage Interest.

(d) The Managers shall allocate Member Nonrecourse Deductions for any taxable year to the Member who bears the risk of loss with respect to the nonrecourse debt to which the Member Nonrecourse Deduction is attributable, as provided in Regulations Section 1.704-2(i) [26 C.F.R. § 1.704-2(i)].

(e) If a Member unexpectedly receives any allocation of loss or deduction, or item thereof, or distributions which result in the Member's having a Negative Capital Account balance at the end of the taxable year greater than the Member's share of Company Minimum Gain, the Company shall specially allocate items of income and gain to that Member in a manner designed to eliminate the excess Negative Capital Account balance as rapidly as possible. Any allocations made in accordance with this provision shall be taken into consideration in determining subsequent allocations under ARTICLE VI, so that, to the extent possible, the total amount allocated in this and subsequent allocations equals that which would have been allocated had there been no unexpected adjustments, allocations, and distributions and no allocation pursuant to Section 6.4(e).

(f) In accordance with Code Section 704(c) [26 U.S.C.A. § 704(c)] and the Regulations promulgated pursuant thereto, and notwithstanding any other provision in this Article, income, gain, loss, and deductions with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among Members taking into account any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this subsection are made solely for federal, state, and local taxes and shall not be taken into consideration in determining a Member's Capital Account or share of Net Profits or Net Losses or any other items subject to Distribution under this Agreement.

**6.5. Distributions.**

The Managers may elect, by majority vote, to make a Distribution of assets at any time that would not be prohibited under the Act or under this Agreement. Such a Distribution shall be

ABC IP, LLC
*Operating Agreement*

made in proportion to the unreturned capital contributions of each Member until all contributions have been paid, and thereafter in proportion to each Member's Percentage Interest in the Company. All such distributions shall be made to those Persons who, according to the books and records of the Company, were the holders of record of Membership Interests on the date of the distribution. Subject to Section 6.6, neither the Company nor any Manager shall be liable for the making of any distributions in accordance with the provisions of this section.

    (a)    Tax Distributions.

        i.    The Company shall make mandatory tax distributions (the "**Tax Distributions**") to each Member in an amount equal to the product of:

            i.    The Member's allocable share of the Company's taxable income for the relevant fiscal year or period, as determined by the Company's accountants in accordance with applicable tax laws, and

           ii.    The highest marginal federal and state income tax rate applicable to an individual resident in Delaware (or such other state as may be determined by the Managing Members or the Board of Directors), including any applicable self-employment taxes.

For the purposes of calculating the Tax Distributions, the Company shall take into account any federal, state, and local taxes that may apply, including those that may be applicable to specific Members based on their tax residency.

    (b)    Timing of Tax Distributions

    The Tax Distributions shall be made to the Members on or before April 15th of each year (or such other date as federal income tax returns are due for individuals without extension), based on the estimated taxable income for the previous fiscal year.

    The Company may, at the discretion of the Managers or the Board of Directors, make additional Tax Distributions throughout the fiscal year to account for any significant changes in the Company's estimated taxable income or changes in applicable tax rates.

    (c)    Adjustments and True-Ups

    If the actual taxable income of the Company for a fiscal year differs from the estimated taxable income, the Company shall make an adjusting Tax Distribution or require a refund of any excess Tax Distribution within 60 days of the filing of the Company's tax return.

    In the event of an adjustment, the Managers shall provide each Member with a statement showing the calculation of the adjustment and any amounts due to or from each Member.

**6.6. Limitations on Distributions.**

    (a) The Managers shall not make any distribution if, after giving effect to the distribution:

**EXHIBIT A**

(1) the Company would not be able to pay its debts as they become due in the usual course of business; or

(2) the Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of distribution, to satisfy the preferential rights of other Members upon dissolution that are superior to the rights of the Member receiving the distribution.

(b) The Managers may base a determination that a distribution is not prohibited under this section on any of the following:

(1) financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances;

(2) a fair valuation; or

(3) any other method that is reasonable under the circumstances.

(c) Except as provided in Corp. Code, § 17254(e), the effect of a distribution under this section is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days after the date of authorization.

(d) A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act, if it is established that the Member or Manager did not act in compliance with this section or Section 6.5 or Section 9.3.

**6.7**. **Return of Distributions.**

Members shall return to the Company any distributions received which are in violation of this Agreement or the Act. Such distributions shall be returned to the account or accounts of the Company from which they were taken in order to make the distribution. If a distribution is made in compliance with the Act and this Agreement, a Member is under no obligation to return it to the Company or to pay the amount of the distribution for the account of the Company or to any creditor of the Company.

**6.8**. **Members Bound by These Provisions.**

The Members understand and acknowledge the tax ramifications of the provisions of this Article of the Agreement and agree to be bound by these provisions in reporting items of income and loss relating to the Company on their federal and state income tax returns.

## ARTICLE VII.
## TRANSFERS AND TERMINATIONS OF MEMBERSHIP INTERESTS

**7.1**. **Restriction on Transferability of Membership Interests.**

A Member may not transfer, assign, encumber, or convey all or any part of his or her Membership interest in the Company, except as provided herein. In entering into this

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships among the Members.

### 7.2. Permitted Transfers.

In order to be permitted, a transfer or assignment of all or any part of a Membership interest must have the approval of the Managers    of the Company. Each Manager, in his or her sole discretion, may proffer or withhold approval. In addition, the following conditions must be met:

(a) the transferee must provide a written agreement, satisfactory to the Members, to be bound by all of the provisions of this Agreement;

(b) the transferee must provide the Company with his or her taxpayer identification number and initial tax basis in the transferred interest;

(c) the transferee must pay the reasonable expenses incurred in connection with his or her admission to Membership;

(d) the transfer must be in compliance with all federal and state securities laws;

(e) the transfer must not result in the termination of the Company pursuant to Code Section 708 [26 U.S.C.A. § 708];

(f) the transfer must not render the Company subject to the Investment Company Act of 1940, as amended [15 U.S.C.A. §§ 80a-1]; and

(g) the transferor must comply with the provisions of Section 7.3.

### 7.3. Company's Right to Purchase Transferor's Interest.

Any Member who wishes to transfer all or any part of his or her interest in the Company shall immediately provide the Company with written notice of his or her intention. The notice shall fully describe the nature of the interest to be transferred. Thereafter, the Company, or its nominee, shall have the option to purchase the transferor's interest at a price equal to the fair market value of the interest as determined by a third-party valuation expert selected by majority vote of the members.

(a) The option provided to the Company shall be irrevocable and shall remain open for thirty (30) days from the date that notice is given, except that if notice is given by regular mail, the option shall remain open for thirty-five (35) days from the date that notice is given to the Company.

(b) At any time while the option remains open, the Company (or its nominee) may elect to exercise the option and purchase the transferor's interest in the Company. The transferor Member shall not vote on the question of whether the Company should exercise its option.

(c) If the Company chooses to exercise its option to purchase the transferor's interest, it shall provide written notice to the transferor within the option period. The notice shall specify a closing date for the purchase, which shall occur within thirty (30) days of the expiration of the option period. On the closing date, the transferor shall be paid in cash the purchase price and shall deliver an instrument of title, free of any encumbrances and containing warranties of title,

ABC IP, LLC                                                                                          Page 25 of 34
*Operating Agreement*

conveying his or her interest in the Company.

(d) If the Company declines to exercise its option to purchase the transferor Member's interest, the transferor Member may then transfer his or her interest in accordance with Section 7.2. Any transfer not in compliance with the provisions of Section 7.2 shall be null and void and have no force or effect.

**7.4. Withdrawal from Membership.**

In the event that a Member withdraws in accordance with Section 4.3, the Company and the Remaining Members shall purchase the interest of the withdrawing Member in the manner described in Section 7.5.

**7.5. Purchase of Interest of Departing Member.**

The purchase price of a Departing Member's interest shall be determined in accordance with the procedure provided in Section 7.3.

(a) Once a value has been determined, each Remaining Member shall be entitled to purchase that portion of the Departing Member's interest that corresponds to his or her percentage ownership of the Percentage Interests of those Members electing to purchase a portion of the Departing Member's interest in the Company.

(b) Each Remaining Member desiring to purchase a share of the Departing Member's interest shall have thirty (30) days to provide written notice to the Company of his or her intention to do so. The failure to provide notice shall be deemed a rejection of the opportunity to purchase the departing Member's interest.

(c) If any Member elects not to purchase all of the Departing Member's interest to which he or she is entitled, the other Members may purchase that portion of the Departing Member's interest. Any interest which is not purchased by the Remaining Members shall be purchased by the Company.

(d) The Managers shall assign a closing date within sixty (60) days after the Members' election to purchase is completed. At that time, the Departing Member shall deliver to the Managers and the Remaining Members an instrument of title, free of any encumbrances and containing warranties of title, duly conveying his or her interest in the Company and, in return, he or she shall be paid the purchase price for his or her interest in cash. The Departing Member, the Managers and the Remaining Members shall perform all acts reasonably necessary to consummate the transaction in accordance with this Agreement.

**7.6. No Release of Liability.**

Any Member or Departing Member whose interest in the Company is sold pursuant to this Article is not relieved thereby of any liability he or she may owe the Company.

**EXHIBIT A**

### 7.7 Dissociation

(a) A Person ceases to be a Member on the happening of any of the following events (a **"Dissociation Event"**)

(i) The withdrawal of a Member with the consent of a Majority of the remaining Members;

(ii) A Member becoming a Bankrupt Member.

(iii) In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person estate;

(iv) In the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(v) In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(vi) In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(vii) In the case of a Member which is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

(b) In the event any Member disassociates prior to the expiration of a stated term of existence as set forth in the Articles of Organization, or in this Agreement, the Member is entitled to the fair market value of their membership interest as determined by an independent third party valuation expert at the time of the Dissociation Event, to be paid within six (6) months of the date of dissociation.  Notwithstanding the foregoing, if the dissociation is as a result of the death or incompetence of the Member, the Managers may pay the actual market value of the Member's Membership Interest in the Company out over a period not to exceed five (5) years, provided that the dissociating Member is entitled to participate as an Assignee in the Company until the value of such interest (plus interest at the Default Interest Rate) is paid in full. The value of the Member's Membership Interest includes the amount of any Distributions to which the Member is entitled under the Agreement and the fair value of the Member's Membership Interest as of the date of dissociation, based upon the Member's right to share in distributions from the Company, reduced by any damages sustained by the Company as a result of the Member's dissociation.

(c) Notwithstanding anything herein to the contrary, if the dissociation is a consensual withdrawal pursuant to Section 7.7(a)(i) above, then the disposition of the Member's interest is to be provided in the terms of the consent to withdraw.

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

## ARTICLE VIII.
## BOOKS, RECORDS, AND REPORTING

### 8.1. Books and Records.

The Managers shall maintain at the Company's principal place of business, or other location agreed upon by the Managers, the following books and records:

(a) a current list of the full name and last-known business or residence address of each Member and Manager set forth in alphabetical order, together with the Capital Contribution, Capital Account, and Membership Interest of each Member;

(b) a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) a copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) the books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) true and correct copies of all relevant documents and records indicating the amount, cost and value of all of the property and assets of the Company.

### 8.2. Accounting Methods.

The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

### 8.3. Reports.

The Managers shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Managers shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns. The Managers shall send to each Member within ninety (90) days of the conclusion of the taxable year:

(a) all information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns and

(b) a copy of the Company's federal, state, and local income tax or information returns for the taxable year.

**EXHIBIT A**

**8.4. Inspection Rights.**

For purposes reasonably related to their interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Managers shall provide Members with copies of all Company records and documents to which Members are entitled under the Act.

**8.5. Bank Accounts.**

The Managers shall maintain all of the funds of the Company in a bank account or accounts in the name of the Company, at a depository institution or institutions to be determined by the majority of the Managers. The Managers shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. The Managers shall have the powers enumerated in Section 5.4 with respect to endorsing, signing, and negotiating checks, drafts, or other evidence of indebtedness to the Company or obligating the Company to pay money to a third party.

**8.6. Partnership Representative.**

The Company designates Cole LeLeux as Partnership Representative, as defined in Code Section 6223(a) [26 U.S.C.A. § 6223(a)] to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations.

## ARTICLE IX.
## DISSOLUTION, LIQUIDATION, AND WINDING UP

**9.1. Conditions Under Which Dissolution Shall Occur.**

The Company shall dissolve and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) at the time specified in the Articles;

(b) upon the happening of a Dissolution Event, and the failure of the Remaining Members to elect to continue, in accordance with Section 7.4;

(c) upon the vote of a two-thirds majority of the Members to dissolve;

(d) upon the entry of a decree of judicial dissolution pursuant to the Act;

(e) upon the happening of any event specified in the Articles as causing or requiring dissolution; or

(f) upon the sale of all or substantially all of the Company's assets.

**9.2. Winding Up and Dissolution.**

If the Company is dissolved, the Managers shall wind up its affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's

ABC IP, LLC
*Operating Agreement*

Page 29 of 34

**EXHIBIT A**

creditors of the commencement of dissolution proceedings.

**9.3. Order of Payment.**

After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members or Managers who are creditors of the Company, the Managers shall distribute the remaining assets among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Section 6.4. Members shall not be required to restore Negative Capital Account Balances.

**9.4. Members' Receipt of Payment.**

Except as otherwise provided in this Agreement or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Net Profits from any individual Member or Manager, except as provided in Article X.

**9.5. Certificates to Be Filed.**

Upon the dissolution of the Company, the Managers shall file a Certificate of Dissolution with the Secretary of State. After the winding up of the Company's affairs has been completed, the Managers shall file a Certificate of Cancellation of the Articles of Organization with the Secretary of State.

## ARTICLE X.
### INDEMNIFICATION OF AGENTS

The Company shall indemnify any Member or Manager and may indemnify any Person to the fullest extent permitted by law on the date such indemnification is requested for any judgments, settlements, penalties, fines, or expenses of any kind incurred as a result of that Person's performance in the capacity of Member, Manager, officer, employee, or agent of the Company, as long as the Member, Manager, or Person did not behave in violation of Sections 5.8 and 5.9.

## ARTICLE XI.
### MISCELLANEOUS PROVISIONS

**11.1. Assurances.**

Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the Managers and the Company or required by this Agreement or the Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

**EXHIBIT A**

## 11.2. Complete Agreement.

This Agreement and the Articles constitute the complete and exclusive statement of the agreement among the Members with respect to the matters discussed herein and therein and they supersede all prior written or oral statements among the Members, including any prior statement, warranty, or representation.

## 11.3. Section Headings.

The section headings which appear throughout this Agreement are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

## 11.4. Binding Effect.

Subject to the provisions of this Agreement relating to the transferability of Membership interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

## 11.5. Interpretation.

All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member or his or her counsel.

## 11.6. Company Counsel.

Company counsel may also be counsel to any Member, Manager, or Affiliate of a Member or Manager, if a majority of the Members who are not individually represented by such counsel agree. The Managers may execute on behalf of the Members and the Company any written consents to such representation as may be required by the Delaware Rules of Professional Conduct or the rules governing professional conduct in other jurisdictions. The Members acknowledge and agree that Company counsel owes them no direct duties and that Company counsel's duties shall be owed to the Company and to any Member or Manager or Affiliate of a Member or Manager which he or she represents individually.

## 11.7. Applicable Law.

Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not the law of conflicts, of the State of Delaware.

## 11.8. Jurisdiction and Venue.

ABC IP, LLC
*Operating Agreement*

Page 31 of 34

**EXHIBIT A**

Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of Texas, County of Travis in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail addressed as provided in Exhibit A attached hereto, and that when service is so made, it shall be as if personal service was effected within the State of Texas.

### 11.9. Specific Performance.

The Members acknowledge and agree that irreparable injury shall result from a breach of this Agreement and that money damages will not adequately compensate the injured party. Accordingly, in the event of a breach or a threatened breach of this Agreement, any party who may be injured shall be entitled, in addition to any other remedy which may be available, to injunctive relief to prevent or to correct the breach.

### 11.10. Reserved.

### 11.11. Remedies Cumulative.

The remedies described in this Agreement are cumulative and shall not eliminate any other remedy to which a Person may be lawfully entitled.

### 11.12. Notices.

Any notice or other writing to be served upon the Company or any Member thereof in connection with this Agreement shall be in writing and shall be deemed completed when delivered to the address specified in Exhibit A, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days' written notice to the Company and the other Members.

### 11.13. Amendments.

Any amendments, modifications, or alterations to this Agreement or the Articles must be in writing and signed by all of the Members.

### 11.14. Severability.

Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of the Agreement which shall continue in full force and effect.

**EXHIBIT A**

**11.15**. **Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

IN WITNESS WHEREOF, all of the Members of ABC IP, LLC, A Delaware Limited-Liability Company, have executed or caused to be executed this Agreement, effective as of the date set forth at the commencement of the document.


By: _____  9-18-24

    Lawrence DeMonico on behalf of LAD, LLC


By: _____  9/17/24

    Kevin Maxwell on behalf of An 1861, LLC


By: _____  9/18/2024

    Cole Leleux on behalf of Leleux, LLC


By: _____  9/18/24

    Michael Register on behalf of Spider Hole, LLC

**EXHIBIT A**

**EXHIBIT A**

**MEMBERS AND MANAGERS OF ABC IP, LLC, LLC, AS OF OCTOBER 21, 2023**

| MEMBER'S NAME | MEMBER'S ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|
| LAD, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 27.5 |
| An 1861, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 17.5 |
| Leleux, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 27.5 |
| Spider Hole, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 27.5 |
| | | $0.00 Total capital | 100% |

Managers:

Lawrence DeMonico
6124 Osceola Trail
Austin, TX 78738

Kevin Maxwell
1095 Torren Pt.
Geneva, FL 32732

Cole LeLeux
2118 White Jasmine Ct.
Apopka, FL 32712

Mike Register
110 Oakwood Dr.
Maitland, FL 32751

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

|  |  |
|---|---|
| **ABC IP, INC.; LAD, LLC; and LAWRENCE DEMONICO** | **CIVIL ACTION NO.:** 1-25-CV-01626 |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** |  |
| **SPIDER HOLE, LLC; SPIKE'S TACTICAL, LLC and MICHAEL REGISTER** |  |
| **Defendants.** |  |

---

## DECLARATION OF ALEX SIMMONS

---

My name is Alex Simmons.  I am over the age of twenty-one (21) years, of sound mind, and am competent to make this declaration.  I have never been convicted of a felony or a crime of moral turpitude. The facts stated in this declaration are within my personal knowledge and are true and correct.

1.  "I am the former Controller of Spike's Tactical, LLC ("Spike's"). I served in the position of Controller from _September_, _2014_ to _June_, _2025_.

2.  I have reviewed the *Response to Defendants' Motion to Dismiss* to which this Declaration is attached. The facts stated therein are true and correct and within my personal knowledge.

3.  In my capacity as Controller, I was aware of the operations of Spike's, and I was aware of the business arrangements it had during my time there. I worked personally with Spike's' owner, Michael "Spike" Register.

4.  Between _2014_ and _2025_, Spike's conducted business in Texas, including by selling its products to Texas businesses.

5.  For example, the distribution center of one of Spike's' largest distributors, RSR Group, Inc., is located in Fort Worth, Texas. Another of Spike's' largest distributors, Primary Arms, L.L.C., is headquartered in Houston, Texas.

6.      During my time at Spike's, Spike's made millions of dollars in revenue between these two distributors."

**UNSWORN DECLARATION**
**PURSUANT TO 28 U.S.C. § 1746**

My name is Alex Simmons, my date of birth is <u>July 26</u>, 19 <u>77</u>, and my address is <u>1221 Piedmont Lakes Blvd</u>. I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in <u>Orange</u> County, State of <u>Florida</u> on December <u>22</u>, 2025.

Signed by:

**Alex Simmons**

—6C4B84BED92940E...

Alex Simmons
*Declarant*

# **<u>EXHIBIT 3</u>**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**ABC IP, INC.; LAD, LLC; and LAWRENCE DEMONICO**

    **Plaintiffs,**

    **v.**

**SPIDER HOLE, LLC; SPIKE'S TACTICAL, LLC and MICHAEL REGISTER**

    **Defendants.**

**CIVIL ACTION NO.:** 1-25-CV-01626

**JURY TRIAL DEMANDED**

---

## DECLARATION OF LAWRENCE DEMONICO

---

My name is Lawrence DeMonico. I am over the age of twenty-one (21) years, of sound mind, and am competent to make this declaration. I have never been convicted of a felony or a crime of moral turpitude. The facts stated in this declaration are within my personal knowledge and are true and correct.

1. "I currently reside in Austin, Texas. I have resided in Austin, Texas since 2009.

2. I am the owner of ABC IP, Inc. and LAD, LLC. Currently, LAD, LLC is a managing member of ABC IP, LLC alongside An 1861, LLC, managed by Kevin Maxwell, and Leleux, LLC, managed by Cole Leleux. I have read the *Response to Defendants' Motion to Dismiss* to which this Declaration is attached. The facts stated herein are true and correct and within my personal knowledge.

3. In my capacity as owner and managing member, I am aware of the operations of ABC IP, Inc., LAD, LLC, and ABC IP, LLC, and I am aware of their business arrangements with Defendants.

4. The Operating Agreement attached as Exhibit 1 to Plaintiffs' *Response to Defendants' Motion to Dismiss* has been reviewed by me and is a true and correct copy of the Operating Agreement entered into by ABC IP, LLC and Defendant Spider Hole, LLC, among others.

5.      Defendant Michael Register, who I understand to be the owner of Defendant Spider Hole, LLC, as well as an owner of Defendant Spike's Tactical, LLC, participated in the negotiation of that Agreement.

6.      From October 2022 to the filing of the above-numbered lawsuit, Defendant Michael Register communicated with me regarding business by and between our respective entities.

7.      Prior to the filing of the above-numbered suit, ABC IP, LLC held multiple claims against Defendants. After discussion among the members of ABC IP, LLC, it became clear that the other members did not share the same willingness or ability as myself to pursue those claims on behalf of ABC IP, LLC.

8.      At that time, An 1861, LLC did not wish to pursue litigation relating to those claims due to other ongoing business matters and conflicts. Similarly, Leleux, LLC was occupied with other commitments. I believed in the merits of the claims and also had related claims of my own. Accordingly, it was agreed that ABC IP, LLC would assign its interests in those claims to my entity, ABC IP, Inc., of which I am the sole owner.

9.      Through its manager Cole Leleux, ABC IP, LLC agreed to assign its claims to ABC IP, Inc. for the purchase price of $500,000.00. ABC IP, LLC has not retained any interest in the claims at issue in the above-numbered lawsuit."

### UNSWORN DECLARATION
### PURSUANT TO 28 U.S.C. § 1746

My name is Lawrence DeMonico, my date of birth is February 18, 1975, and my address is 6124 Osceola Trail, Austin, TX 78738.  I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Travis County, State of Texas on December 23, 2025.

_____

Lawrence DeMonico
*Declarant*

## Operating Agreement of ABC IP, LLC

### A Delaware Limited Liability Company

By this OPERATING AGREEMENT (the "**Agreement**"), made and entered into on September 17, 2024, however the parties agree that the terms of this agreement shall be effective as of December 02, 2020 replacing and superseding all previous agreements. All rights, obligations, and responsibilities set forth herein shall be deemed to have commenced as of the effective date, notwithstanding the later execution date. Those persons and entities whose names, addresses and signatures are set forth below, being the Members of ABC IP, LLC (the "**Company**"), hereby represent and agree that they have filed, on behalf of the Company, Articles of Organization with the Secretary of State for the State of Delaware, and that they desire to enter into an operating agreement in accordance with the Act (as defined below) in order to establish their respective rights and obligations in connection with forming the Company.

NOW, THEREFORE, in consideration of the mutual covenants and provisions contained in this Agreement, the Members agree as follows:

### ARTICLE I.
### DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

**1.1**.

"**Act**" means the Delaware Limited Liability Act, as amended from time-to-time.

"**Affiliate of a Member or Manager**" means any Person under the control of, in common control with, or in control of a Member or Manager, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited-liability company, the ability to exercise more than fifty percent (50%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

"**Agreement**" means this Operating Agreement, in its original form and as amended from time-to-time.

"**Articles**" means the Articles of Organization filed with the Delaware Secretary of State forming this limited liability company, as initially filed and as they may be amended from time-to-time.

ABC IP, LLC
*Operating Agreement*

Page 1 of 34

**EXHIBIT A**

"**Bankruptcy**" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

"**Capital Account**" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as (1) increased by any additional contributions and the Member's share of the Company's profits; and (2) decreased by any distribution to that Member as well as that Member's share of Company losses.

"**Capital Contribution**" means the total amount of money and the fair market value, net of liabilities, of any property contributed by the Members to the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended from time-to-time, or any corresponding provision of any succeeding revenue law.

"**Company**" means ABC IP, LLC, the entity formed in accordance with this Agreement and the Articles.

"**Company Minimum Gain**" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d).  [26 C.F.R. § 1.704-2(d)].

"**Corporations Code**" means the Delaware Corporations Code, as amended from time-to-time and the provisions of any succeeding law.

"**Departing Member**" means any Member whose conduct results in a Dissolution Event or who withdraws from the Company in accordance with Section 4.3, where such withdrawal does not result in dissolution of the Company.

"**Dissolution Event**" means, with respect to any Member, one or more of the following: the death, resignation, retirement, expulsion, bankruptcy, or dissolution of any Member.

"**Distribution**" means the transfer of money or property by the Company to the Members without consideration.

"**Fiscal Year**" means the Company's fiscal year, which shall be the calendar year.

**EXHIBIT A**

"**Founder Purchase Value**" means a repurchase price calculated by the number of years the Founding Member has been a member in the Company, multiplied by $50,000. For example, if the Founding Member has been a member for two and a half years, their Founder Repurchase Value would be $125,000.

"**Founding Member**" means LAD, LLC; An 1861, LLC; LeLeux, LLC; and Spider Hole, LLC or their authorized assignee. No other member, unless otherwise provided herein, who becomes a member after the execution of this Agreement shall be considered a Founding Member.

"**Majority Interest**" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

"**Manager**" means the Person or Persons designated as such in ARTICLE V.

"**Member**" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

"**Member Nonrecourse Debt**" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations Section 1.704-2(b)(4). [26 C.F.R. § 1.704-2(b)(4)].

"**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Code Section 705(a)(2)(B) [26 U.S.C.A. § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

"**Membership Interest**" means a Member's rights in the Company, collectively, including the Member's economic interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the Act.

"**Negative Capital Account**" means a Capital account with a balance of less than zero.

"**Net Profits**" and "**Net Losses**" mean the Company's income, loss, and deductions computed at the close of each fiscal year in accordance with the accounting methods used to prepare the Company's information tax return filed for federal income tax purposes.

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

"**Nonrecourse Liability**" has the meaning provided in the Regulations Section 1.752-1(a)(2). [26 C.F.R. § 1.752-1(a)(2)].

"**Partnership Representative**", as defined in Code Section 6223(a) [26 U.S.C.A. § 6223(a)], is that Person designated by the Company in Section 8.6 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

"**Percentage Interest**" means the percentage ownership of the Company of each Member as set forth in the column entitled "Member's Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time-to-time pursuant to this Agreement.

"**Person**" means an individual, partnership, limited partnership, corporation, limited-liability company, registered limited liability partnership, trust, association, estate, or any other entity.

"**Positive Capital Account**" means a Capital Account with a balance greater than zero.

"**Regulations**" as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations which may be promulgated.

"**Remaining Members**" means, upon the occurrence of a Dissolution Event, those Members of the Company whose conduct did not cause its occurrence.

"**Secretary of State**" means the Secretary of State for the State of Delaware.

"**Timely**" unless otherwise provided herein, shall be within two weeks of the request being made.

## ARTICLE II.
## FORMATION AND ORGANIZATION

### 2.1. Initial Date and Initial Parties.

This Agreement entered into on September 18, 2024, superseding the prior organizational documents filed on or about December 2, 2020, by and among the Company and the Persons who are Members of the Company on that date.

ABC IP, LLC
*Operating Agreement*

Page 4 of 34

**EXHIBIT A**

## 2.2. Subsequent Parties.

No Person may become a Member of the Company without agreeing to and without becoming a signatory of this Agreement, and any offer or assignment of a Membership interest is contingent upon the fulfillment of this condition.

## 2.3. Name.

The name of this Company is ABC IP, LLC.

## 2.4. Term.

The Company commenced upon the filing of its Articles and it shall continue in existence until terminated earlier under the provisions of the Act or Section 9.1 of this Agreement.

## 2.5. Principal Place of Business.

The Company will have its principal place of business at 8 The Green, Suite A, Dover, DE 19901, or at any other address upon which the Managers agree. The Company shall maintain its principal executive offices at its principal place of business, as well as all records and documents which it is required to keep by the Act.

## 2.6. Names and Addresses of Members and Managers.

The name, present mailing address, taxpayer identification number, and percentage ownership of each Member is listed on Exhibit "A" attached hereto. The name and present mailing address of each Manager is also listed in Exhibit A.

## 2.7. Authorization and Purpose.

Pursuant to the Act, the Members have formed this Company and, in accordance therewith, have filed Articles of Organization with the Secretary of State. The Members intend to govern the Company in accordance with the Act, the Articles, and this Agreement and to have their rights and liabilities in connection with the Company to be so determined. In the event of any conflict between the Act and the Articles and Agreement, this Agreement will control, to the extent permitted by the Act.

The purpose of the Company is to engage in any lawful business activity that is permitted by the Act.

**EXHIBIT A**

# ARTICLE III.
## CAPITAL CONTRIBUTIONS AND ACCOUNTS

### 3.1. Initial Capital Contributions.

The initial Capital Contribution of each Member is listed in Exhibit A attached hereto. Exhibit A shall be revised to reflect any additional contributions pursuant to Section 3.2.

### 3.2. Additional Contributions.

Only Spider Hole, LLC shall be responsible for providing additional capital as deemed necessary by the Managers. Upon agreement by the majority of the Managers Spider Hole, LLC shall be required to contribute additional capital to the Company. Upon receipt of such additional contributions, Spider Hole, LLC's capital account shall be adjusted accordingly.

### 3.3. Interest Payments.

No Member shall be entitled to receive interest payments in connection with any contribution of capital to the Company.

### 3.4. Right to Return of Contributions.

No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement in ARTICLE IX.

### 3.5. Capital Accounts.

A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations Section 1.704-1(b)(2)(iv) [26 C.F.R. § 1.704-1(b)(2)(iv)], which shall reflect all Capital Contributions to the Company. Should any Member transfer or assign all or any part of his or her membership interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

### 3.6. Failure of Member to Make Contribution.

Spider Hole, LLC shall make timely payment to the Company of required Capital Contributions. The failure to make such a contribution will render Spider Hole, LLC in default under this Agreement. If a default occurs, the Managers will give the defaulting Member written notice that the default must be cured within fifteen (15) days from the date that such notice is mailed. If the defaulting Member fails to make the required Capital Contribution to the Company within the fifteen (15)-day period, the Managers may, at their sole discretion, elect to take any of the following actions:

(a) The non-defaulting Members may elect to dissolve the Company, in which case the Company shall be duly liquidated and wound up in accordance with ARTICLE IX;

ABC IP, LLC
*Operating Agreement*

Page 6 of 34

**EXHIBIT A**

(b) The Company or the non-defaulting Members may purchase the defaulting Member's interest for the Founder Repurchase Value;

(c) The defaulting Member shall forfeit his or her voting and approval rights under this Agreement, the Articles, and the Act, until the default is cured;

(d) The defaulting Member shall lose his or her right to receive distributions until the non-defaulting Members who advance funds to the Company shall be repaid those monies as well as a cumulative, non-compounded return thereon at the rate ten percent (10%) per annum; or

(e) The defaulting Member shall lose the ability to participate, whether as Member or Manager, in the management and affairs of the Company, until the default is cured.

Election by the Managers to pursue any of the foregoing remedies shall not be deemed a waiver of or limitation on the right to pursue any other remedy available under this Agreement or at law or equity in the event of a subsequent default.

Each Member agrees that: (1) the Company and the non-defaulting Members shall incur certain costs, obligations, and damages in the event of a default by any Member, which shall be extremely difficult to ascertain; (2) the remedies described in this Section 3.6 bear a reasonable relationship to the damages that may be suffered in the event that any Member defaults in his or her obligation to make the required Capital Contribution to the Company; and (3) election of any of the foregoing remedies would not be unreasonable based on the facts and circumstances existing as of the date that this Agreement is executed.

## ARTICLE IV.
## MEMBERS

### 4.1. Limitation of Liability.

No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his or her Membership in the Company, except as expressly set forth in this Agreement or required by law.

### 4.2. Additional Members.

The Managers may admit additional Members to the Company only if approved by a Majority Interest of the Members. Additional Members shall be permitted to participate in management at the discretion of the Managers upon agreement by the existing Members. Likewise, the Managers shall determine and the existing Members shall agree upon an Additional Member's participation in "Net Profits," "Net Losses," and distributions, as those terms are defined in ARTICLE I. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and percentage ownership of any Additional Members.

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

### 4.3. Withdrawal from Membership.

Any Member who is under an obligation to render services to the Company may withdraw at any time after sixty (60) days' written notice to the Company, without prejudice to the rights of the Company or any Member under any contract to which the withdrawing Member is a party. Such withdrawing Member shall have the rights of a transferee under ARTICLE VII and the remaining Members shall be entitled to purchase the withdrawing Member's Membership interest in accordance with Section 7.3. In the event of such a withdrawal, Exhibit A shall be amended to reflect the change in ownership interests. No other Members are permitted to withdraw from the Company.

### 4.4 Active Participation

Each Member of the Company is required to actively participate in the management, operations, and business activities of the Company. Active participation shall be defined as:
   a) Regularly attending and contributing to meetings and discussions concerning the Company's business;
   b) Participating in decision-making processes;
   c) Fulfilling any roles or responsibilities assigned to the Member by the Company; and
   d) Engaging in activities that further the Company's business interests as reasonably determined by the Managing Members or the Board of Directors.

The Managers shall have the authority to set specific expectations and metrics for active participation, which may be documented in writing and provided to the Members.

If a Member fails to actively participate for a continuous period of 3 months for a reason not related to health or some other issue outside of their control, the participating Members shall have the right to purchase the membership interest of the non-participating Member for the Founder Repurchase Value.

### 4.5. Competing Activities.

The Members and their officers, directors, shareholders, partners, managers, agents, employees and Affiliates are permitted to participate in other business activities which may be in competition, direct or indirect, with those of the Company. The Members further acknowledge that they are under no obligation to present to the Company any business or investment opportunities, even if the opportunities are of such a character as to be appropriate for the Company's undertaking. Each Member hereby waives the right to any claim against any other Member or Affiliate on account of such competing activities. Provided, however, that the provisions of Section 4.4 do not apply to Members who are Managers of the Company.

### 4.6. Compensation of Members.

No Member or Affiliate shall be entitled to compensation for services rendered to the Company, absent agreement by the Members. However, Members and Affiliates shall be entitled to reimbursement for the actual cost of goods and services provided to the Company, including, without limitation, reimbursement for any professional services required to form the

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

Company.

## 4.7. Transactions with the Company.

The Managers may permit a Member to lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the Act. To the extent permitted by applicable laws, such a Member shall be treated like any other Person with respect to transactions with the Company.

## 4.8. Members Are Not Agents.

Each of the Members of the Company has agreed to delegate the management of the Company to the Managers and, accordingly, expressly relinquishes any rights he or she might otherwise have to act on behalf of the Company, to incur liability on behalf of the Company or to bind the Company in any way. Unless authorized by the Act, this Agreement or the Managers, Members shall not act as agents of the Company.

## 4.9. Meetings.

(a) There will be no regular or annual meetings of the Members. However, any Manager or Members with an aggregate Percentage Interest of ten percent (10%) or more may call a meeting of the Members at any time. Such meeting shall be held at a place to be agreed upon by the Managers or, if no agreement can be reached, at the Company's principal executive office. The meeting shall be held during normal business hours.

(b) The Managers shall appoint one Member to preside at the meeting and another Member to act as secretary. The secretary shall prepare minutes of the events transpiring at the meeting, which shall be maintained along with the books and records indicated in Section 8.1 at the Company's principal place of business.

(c) If any action on the part of the Members is to be proposed at the Meeting, then written notice of the meeting must be provided to each Member entitled to vote not less than three (3) days or more than sixty (60) days prior to the meeting. Notice may be given in person, by first-class mail, email or other written communication (not including text messages), charges prepaid, addressed to each Member at the address listed for that Member in Exhibit A. Notice shall be deemed complete upon personal delivery, transmission of the facsimile or telegram, or when deposited in the mail or sent in writing in some other manner. The notice shall contain the date, time, and place of the meeting and a statement of the general nature of the business to be transacted there. Matters which are not contained in the notice may not be addressed at the meeting.

(d) Any Member entitled to call a meeting may request in writing that any Manager provide the aforementioned notice to all Members entitled to vote at the meeting. If the written notice is not given by the Manager within twenty (20) days of the request, the Member may then give notice of the meeting.

(e) An affidavit of the mailing of notice shall be prepared by the Manager, Member, or other employee of the Company that actually causes written notice of the meeting to be

**EXHIBIT A**

transmitted to the Members.  The affidavit shall be maintained at the Company's principal place of business, along with the books and records listed in Section 8.1.

**4.10**. **Actions at Meetings.**

(a) No action may be taken at a meeting that was not proposed in the notice of the meeting, unless there is unanimous consent among all Members entitled to vote.

(b) No action may be taken at a meeting unless a quorum of Members is present, either in person or by proxy.  A quorum of Members shall consist of Members holding a majority of the Percentage Interest in the Company.  Once a quorum has been established at a duly held meeting, business may be regularly transacted at that meeting without adjournment, notwithstanding that the quorum is no longer present, so long as Members holding a majority of the Percentage Interest in the Company approve any action taken.

(c) A Member may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Members are able to hear each other.  A Member participating in accordance with the preceding sentence shall be deemed present at the meeting.

(d) Any meeting may be adjourned upon the vote of the majority of the Membership Interests represented at the meeting.  A quorum of Members need not be present to conduct the vote.  If a duly held meeting is adjourned to another time and place, no notice of the time and place of the adjourned meeting is required, if there is an announcement at the time of the adjournment of when and where the meeting is to be resumed and it is resumed within forty-five (45) days of adjournment.  Notice in accordance with the provisions of Section 4.9(c) is required if a new record date for the meeting is subsequently set or if the adjournment is for a period in excess of forty-five (45) days from the date of the original meeting, in which case the Managers shall set a new record date.  Any business which could have been transacted at the original meeting may be transacted at the adjourned meeting.

(e) Actions taken at any meeting of the Members, regardless of where it is held or whether it is noticed and conducted in accordance with the foregoing rules, have the same force and validity as actions taken at a duly noticed and held meeting, if there is a quorum present in person or by proxy, and if, either before or after the meeting, each Member who was entitled to vote at the meeting but who was not present in person or by proxy, signs a written waiver of notice, consent to the holding of the meeting, or approval of the minutes of the meeting.  A written waiver of notice need not contain a statement of the purpose of the meeting or the business to be transacted, except if it is to be given in support of an action taken at a meeting which was not stated in the notice.  All such written waivers, consents, or approvals shall become part of the records of the Company and shall be maintained at the Company's principal place of business along with the books and records listed in Section 8.1.

(f) Any Member who attends a meeting shall be deemed to have waived his or her right to object to the notice of the meeting, unless the Member expresses such an objection at the commencement of the meeting.  Attendance at a meeting shall not constitute a waiver of the right to object to the transaction of any business which was not disclosed in the notice of the meeting, so long as the objection is asserted at the meeting.

(g) Members who are entitled to vote at a meeting may do so in person or by authorizing another Person or Persons to act as proxy.  The proxy must be in writing, executed by the

ABC IP, LLC                                                                                      Page 10 of 34
*Operating Agreement*

**EXHIBIT A**

Member authorizing it, and it must be filed with the Managers or secretary, if any, of the Company. A proxy will be deemed executed if the Member's name is placed on the proxy, whether manually, typed, electronically transmitted or otherwise, by the Member or his or her attorney in fact. If the proxy does not state on its face that it is irrevocable, it shall continue in full force and effect unless either (1) the Member who issued the proxy revokes it prior to the vote pursuant to the proxy by (A) delivering written notice to the Company that the proxy is revoked, (B) issuing a subsequent proxy, or (C) attending the meeting and voting in person; or (2) the Company is notified of the death or incapacity of the Member who authorized the proxy, before the vote pursuant to the proxy is counted. Notwithstanding the foregoing, no proxy shall remain in effect for more than eleven (11) months, unless the face of the proxy indicates a longer term. The revocability of any proxy which states on its face that it is irrevocable will be determined in accordance with the applicable provisions of the Corporations Code.

**4.11. Actions Without Meetings.**

Any action that may be taken at a meeting of the Members may be taken without a meeting and without prior notice, if written consents to the action are submitted to the Company within sixty (60) days of the record date for the taking of the action, executed by Members holding a sufficient number of votes to authorize the taking of the action at a meeting at which all Members entitled to vote thereon are present and vote. All such consents shall be submitted to the Managers or the secretary, if any, and shall be maintained as a part of the Company's records. Any Member who signs such a written consent, or the Member's proxy holders, may revoke the consent by submitting a written revocation to the Managers or secretary which is received prior to the filing with the Company of a sufficient number of written consents to authorize the taking of the action. Unless written solicitations of consent have been circulated to all Members entitled to vote: (1) notice of any action taken pursuant to submission of written consents shall immediately be given to any Member who did not submit a written consent; and (2) if the action to be taken is the dissolution or merger of the Company, such action shall not be consummated until at least ten (10) days after notice is received by each Member who has not consented in writing to the action.

**4.12. Record Date.**

To enable the Company to determine the Members entitled to receive notice of any meeting, to vote, to receive distributions, to exercise any rights with regard to distributions, or to exercise any other lawful right granted by this Agreement, the Articles, or the Act, the Managers or Members representing in excess of ten percent (10%) of the Percentage Interests in the Company may fix, in advance, a record date that is not more than sixty (60) or less than ten (10) days prior to the date of such meeting or more than sixty (60) days prior to any other action. If no record date is fixed, the record date shall be determined in accordance with the Act.

**4.13. Voting Rights.**

Except as expressly provided in the Articles or in this Agreement, Members shall have no voting, approval, or consent rights. Members shall have the right to approve or disapprove matters as stated in the Articles and in this Agreement, including, without limitation, the following actions:

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

(a) The following actions shall require the unanimous vote, approval, or consent of all Members who are neither the subjects of a dissolution event nor the transferors of a Membership Interest:

(1) approval of the purchase by the Company or its nominee of the Membership Interest of a transferor Member in accordance with Section 7.3;

(2) approval of the sale, transfer, exchange, assignment, or other disposition of a Member's interest in the Company, and admission of the transferee as a Member pursuant to Section 7.1;

(3) a decision to make any amendment to the Articles or to this Agreement, in accordance with Section 11.13; and

(4) a decision to compromise the obligation of any Member to make a Capital Contribution or return money or property distributed in violation of the Act.

(b) Except as set forth in Section 5.4, all other matters requiring the vote, approval, or consent of the Members may be authorized upon the vote, approval, or consent of those Members holding a majority of the Percentage Interests in the Company.

(c) In the event that any Member shall abstain from a vote taken by the membership of the Company, such abstention shall not serve to block the remaining members from reaching a unanimous or majority decision on the issue presented. Specifically, all matters shall be deemed ratified by either the majority or unanimous (as applicable) vote of the voting members, not merely the members entitled to vote.

### 4.14. Removal of Members.

(a)     Grounds For Removal

A Member may be removed from the Company upon the unanimous consent of all other Members for any of the following reasons:

(i) Breach of any material provision of this Operating Agreement;

(ii) Breach of fiduciary duties owed to the Company or its Members;

(iii) Engaging in illegal, fraudulent, or unethical conduct that materially and adversely affects the business or reputation of the Company;

(iv) Financial misconduct, including but not limited to embezzlement, misappropriation of Company funds, or misuse of Company assets;

(v) Failure to perform duties as required by this Operating Agreement or as reasonably expected by the other Members including, but not limited to, meeting all capital contribution requirements and participating in the management of the Company;

**EXHIBIT A**

(vi) Prolonged absence or incapacity preventing the Member from fulfilling their obligations to the Company; or

(b)     Procedure for Removal

(i) A meeting of the Members shall be called to discuss the proposed removal of the Member. The Member subject to potential removal shall be given at least ten (10) business days' notice of the meeting and the reasons for the proposed removal.

(ii) At the meeting, the Member subject to removal shall have the opportunity to present their case and respond to the reasons for the proposed removal.

(iii) Following the discussion, a vote shall be taken. The Member subject to removal shall not have voting rights on their own removal. The unanimous consent of all remaining Members is required to remove the Member.

(iv) If the required unanimous consent is obtained, the Member shall be deemed removed from the Company effective immediately, and the removed Member shall no longer have any rights or obligations as a Member of the Company, except as otherwise provided in this Operating Agreement or under applicable law.

(v)     Upon the occurrence of a vote to remove a Member pursuant to this Section, the removed member shall be paid the Founder Repurchase Value in exchange for their membership interest.

**(c) Effect of Removal**

(i) The removed Member shall cooperate in executing any necessary documents to effectuate their removal and the transfer of their interest in the Company.

(ii) The removed Member shall continue to be bound by the confidentiality and non-compete provisions of this Operating Agreement, if any, for the duration specified therein.

## ARTICLE V.
## MANAGEMENT

**5.1**. **Exclusive Management.**

The Company shall be managed by the Managers. The Managers shall have exclusive authority, discretion, power, and control to manage the property, business and affairs of the Company, and to make all decisions and perform all services incident to the management thereof, except as otherwise provided in this Agreement or the Act.

**5.2**. **Time Commitments.**

The Managers shall devote the time, effort, and skill that they reasonably believe is

ABC IP, LLC                                                                 Page 13 of 34
*Operating Agreement*

**EXHIBIT A**

necessary to conduct the affairs of the Company and to attend to all matters concomitant to the business of the Company. The Managers are not required to devote all of their time or efforts to the operation of the Company.

### 5.3. Management Powers.

Subject to the express limitations contained in Section 5.4 and elsewhere in this Agreement or in the Articles, the Managers shall have all powers necessary to carry out the purposes of and to manage the business, property, and affairs of the Company, including, without limitation, the powers enumerated in the Act, including the power to:

(a) acquire, purchase, alter, renovate, improve, demolish, rebuild, replace, and hold real property and any other property or assets or to acquire options to purchase such property or assets, wherever located, that the Managers determine to be in the furtherance of the Company's business or in the best interests of the Company;

(b) make contracts and guarantees, incur liabilities, act as surety, borrow money, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of, and extend the time for payment of any indebtedness or obligation of the Company; and secure such indebtedness with a lien on Company assets, such as a mortgage, deed of trust, pledge, or security interest;

(c) sell, lease, exchange, transfer, convey, mortgage, pledge, and otherwise dispose of all or any part of the Company's property and assets, or any interest therein;

(d) lend money to the Company and otherwise assist its members and employees;

(e) purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of and otherwise use and deal in and with stock or other interests in and obligations of any person, or direct or indirect obligations of the United States or of any government, state, territory, governmental district, or municipality, or of any instrumentality of any of them;

(f) be a promoter, stockholder, partner, member, manager, associate, or agent of any person;

(g) indemnify or hold harmless any person or guarantee the payment of money or the performance of any contract or obligation of any person;

(h) sue on, defend, or compromise any claim or liability in favor of or against the Company or submit any such claim to arbitration or other alternative means of dispute resolution or confess a judgment against the Company in connection with any litigation with which the Company is involved; and

(i) retain auditors, legal counsel, and such other professional services as the Company may require and determine the appropriate compensation for the same.

### 5.4. Limitations on Powers.

The Managers shall not be authorized to permit the Company to perform the following acts or to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest or such greater Percentage Interest as

ABC IP, LLC
*Operating Agreement*

Page 14 of 34

**EXHIBIT A**

may be indicated below:

(a) the sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a part of a single transaction or a series of transactions over a 12-month period, except if the same is part of the orderly liquidation and winding up of the Company's affairs upon the duly authorized dissolution of the Company, shall require the affirmative vote or written consent of Members holding at least 55% of the Percentage Interests in the Company;

(b) the merger of the Company with another limited liability company or limited partnership shall require the affirmative vote or the written consent of Members holding at least 55% of the Percentage Interests in the Company, provided that no Member may be required to become a general partner in the merged entity absent his or her express written consent thereto;

(c) the merger of the Company with a corporation, a general partnership, or other Person shall require the affirmative vote or written consent of all Members;

(d) any alteration of the primary purpose or business of the Company as set forth in Section 2.8 shall require the affirmative vote or written consent of Members holding at least 55%% of the Percentage Interests in the Company;

(e) the establishment of different classes of Members;

(f) without limiting subsection (f) of this section, the lending of money to any Member, Manager, or Affiliate of either;

(g) any act which would prevent the Company from conducting its duly authorized business;

(h) the confession of a judgment against the Company;

(i) the filing of a petition under Title 11 of the United States Code on behalf of the Company; and

(j) any other act or transaction for which the consent of the Members is required, either in this Agreement or under the Act.

Notwithstanding any other provision of this Agreement, the written consent of all of the Managers is required to permit the Company to incur an indebtedness or obligation greater than $100,000. All checks, drafts, or other instruments requiring the Company to make payment of an amount less than $100,000 may be signed by any Manager, acting alone. Any check, draft, or other instrument requiring the Company to make payment in the amount of $100,000 or more shall require the signatures of 2 Managers acting together. Any Manager, acting alone, may endorse checks, drafts, or other evidence of indebtedness to the Company, but only for deposit into one of the Company's accounts.

**5.5**. **Meetings.**

Any Manager or officer may call a meeting of the Managers upon four (4) days' notice by mail or forty-eight (48) hours' notice delivered personally, by email, or telephone. The notice need not indicate the purpose for which the meeting is called.

ABC IP, LLC
*Operating Agreement*

Page 15 of 34

**EXHIBIT A**

(a) Notice of a meeting need not be given to any Manager who executes a waiver of notice or a consent to the holding of the meeting, whether before or after the meeting, or who attends the meeting without objecting to the lack of notice prior to the commencement thereof or who approves the minutes of the meeting. All such waivers, consents, or approvals shall be filed with the Company and be made a part of the minutes of the meeting, but they need not indicate the purpose for which the meeting was called.

(b) A majority of the Managers present at the meeting, whether or not they constitute a quorum, may adjourn any meeting to another time and place. If the adjournment is for a period greater than twenty-four (24) hours, notice of the adjourned time and place shall be given prior to the time of the adjourned meeting to any Manager who was not present when the meeting was adjourned.

(c) Meetings of the Managers may be held at any place specified in the notice of the meeting, whether within or without the State of Delaware. If the notice does not designate a meeting place, then the meeting shall be held at any place agreed upon by the Managers or at the principal executive office of the Company.

(d) A Manager may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Managers are able to hear each other. A Manager participating in accordance with the preceding sentence shall be deemed present at the meeting.

(e) A majority of the authorized number of Managers constitutes a quorum of Managers for the transaction of business. Unless the Articles or this Agreement expressly require the approval of all Managers, every act performed or decision made by a majority of the Managers present at a duly held meeting, at which a quorum is present, is the act or decision of the Managers. The Managers may continue to transact business at a meeting at which a quorum was initially present, notwithstanding that one or more Managers depart, as long as any action taken is approved by at least a majority of the required quorum for the meeting.

(f) The decision to have a meeting is solely that of the Managers. The provisions of this Section 5.5 govern the procedures for conducting a meeting, should the managers, in their sole discretion, elect to hold a meeting. Nothing in this Section 5.5 is intended to create a requirement that meetings be held, as the Members expressly intend that meetings of the Managers are not required.

**5.6**. **Actions Without Meetings.**

Any action required or permitted to be taken by the Managers may be taken without a meeting, if a majority of the Managers individually or collectively consent in writing to the taking of the action, except in such cases where the Articles or this Agreement require the unanimous consent of the Managers, in which case all Managers must execute written consents. Any action taken by written consent shall have the same force and effect as an action taken by a vote of the Managers.

**5.7**. **Election and Removal of Manager.**

(a) The Company shall initially have three (3) Managers, Cole LeLeux, Lawrence DeMonico, Kevin Maxwell. The Company may, from time-to-time, fix the number of Managers that it shall have, upon the affirmative vote or written consent of a Majority Interest of the

ABC IP, LLC          Page 16 of 34
*Operating Agreement*

Members.  However, the Company may not have less than one (1) Manager at any time.  Should the Members elect to increase the number of Managers or to reduce it from more than one to one, the Articles shall be amended to so indicate.

(1) Unless a Manager resigns or is removed, each Manager shall serve.

(2) The Managers shall be elected by the affirmative vote or written consent of a Majority Interest of the Members.

(3) A Manager may, but need not, be a Member.  The Managers need not be individuals, residents of the State of Delaware, or citizens of the United States.

(b) A Manager may be removed at any time, with or without cause, upon the affirmative vote of Members holding a Majority Interest at a meeting expressly called for the purpose of such a vote.  The removal shall be without prejudice to the rights, if any, of the Manager under any employment contract with the Company.  If the Manager is a Member, his or her removal shall not affect any rights he or she has as a Member, nor shall it constitute a withdrawal from Membership.

(c) A Manager may resign at any time by providing written notice to each Member and the remaining Managers.  The resignation shall be effective immediately upon receipt of the notice, unless a later time is specified in the notice. Acceptance of the resignation is not required to make it effective, unless the notice provides otherwise.  The resignation shall be without prejudice to the rights, if any, of the Company under any contract with the Manager.  If the Manager is a Member, his or her resignation shall not affect any rights he or she has as a Member, nor shall it constitute a withdrawal from Membership.

(d) A vacancy shall exist if any Manager is removed, resigns, or dies, if there is an increase in the number of authorized positions or if the Members fail to elect a sufficient number of Managers to fill the authorized positions.  If a vacancy occurs, it may be filled by the affirmative vote or written consent of Members holding a Majority Interest.

**5.8. Liability for Performance of Duties; Duty of Care.**

(a) The Managers shall perform their managerial duties in good faith, in a manner that they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in the same position would exercise in similar circumstances.  A Manager who so performs the duties of Manager shall not incur any liability to the Company by reason of being or having been a Manager of the Company.

(b) In performing their duties, the Managers shall be entitled to rely upon information, reports, opinions, or statements made by or received from the following Persons or groups, unless the Managers are in the possession of information regarding the matter in question sufficient to render such reliance unwarranted and provided that the Managers act in good faith and after a reasonable inquiry when the need therefore is indicated by the circumstances:

(1) Any officer, employee, or other agent of the Company whom the Managers reasonably believe to be trustworthy and competent regarding the matters presented;

(2) Any attorney, independent accountant, or other professional with regard to matters which the Managers reasonably believe to be within such person's area of expertise or competence; or

ABC IP, LLC
*Operating Agreement*

(3) Any committee upon which the Manager does not serve, duly created in accordance with the provisions of this Agreement or the Articles, as to matters within its designated authority, which committee the Managers reasonably believe to be competent regarding the matters within the ambit of its authority.

**5.9**. **Duty of Loyalty.**

Subject to the provisions of Section 5.10, Managers owe the same duty of loyalty to the Company and the Members that a partner owes to the partnership and the partners of the partnership.

**5.10**. **Transactions Between Company and Manager.**

Any Manager or Affiliate of a Manager may engage in transactions with the Company, notwithstanding that such transactions may constitute a conflict of interest, as long as the transaction is not expressly prohibited by this Agreement or the Act and both of the following conditions are met:

(a) The terms and conditions of the transaction are fair and reasonable to the Company and are at least as favorable as those that are generally available from Persons capable of providing the same or similar services and those between parties operating at arms length; and

(b) A majority of the Members having no interest in the transaction (other than their interest as Members) consummating the transaction.

**5.11**. **Compensation.**

Unless otherwise provided in this Agreement, no Manager or Affiliate of a Manager is entitled to compensation for services performed for or goods provided to the Company.

(a) The Company shall reimburse the Managers for the actual costs of goods used by or on behalf of the Company. Any Manager who incurs expenses for professional services required in connection with the formation of the Company and preparation of appropriate documentation shall be reimbursed for such expenses.

(b) The Company shall not provide reimbursement for the following expenses, except where permitted by this Agreement:

(1) overhead expenses of the Managers, including but not limited to rent and general office expenses;

(2) salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of a Manager or Affiliates; and

(3) the cost of providing any goods or rendering any services for which a Manager or Affiliate is entitled to compensation under this Agreement.

**5.12**. **Limitation on Exposing Members to Personal Liability.**

Neither the Company nor the Managers nor any Member may take any action which will have the effect of exposing any Member of the Company to personal liability for the obligations of the Company, without first obtaining the consent of the affected Member.

**5.13**. **Limitations on Manager's Liability.**

No Person who is a Manager shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager of the Company.

**5.14**. **Membership Interests of Manager.**

A Manager who holds a Membership Interest shall be entitled to all of the rights and privileges of a Member who is not a Manager, including without limitation the economic, voting, information, and inspection rights, unless otherwise provided in this Agreement.

**5.15. Officers.**

(a) The Managers may appoint officers, if they deem it necessary to the running of the Company. The officers shall consist of a president, secretary, and a chief financial officer. At the sole discretion of the Managers, a chairperson and vice president may also be appointed. The officers shall serve at the pleasure of the Managers, subject to all of the rights, if any, of an officer under a contract of employment. Any number of offices may be held by the same person. Officers need not be residents of the State of Delaware or citizens of the United States. The officers shall have such powers and shall perform such duties as may be determined by the Managers from time-to-time, subject to the guidelines and specifications contained in this Agreement.

(b) Subject to the rights, if any, that an officer may have under a contract of employment, an officer may be removed at any time at the pleasure of the Managers. An officer may resign at any time upon written notice to the Company, without prejudice to the rights, if any, of the Company under any contract of employment to which the officer is a party. The resignation shall be deemed effective upon receipt of the written notice, unless the notice contains a different date. Acceptance of the resignation shall not be necessary to make it effective, unless the notice specifies otherwise. Upon the removal, resignation, death, disqualification, or incapacity of any officer, the Managers may declare such office vacant and fill it in the manner prescribed for regular appointments to that office.

(c) The Managers shall fix by resolution the salaries, not to exceed $1,000,000 per person annually, of all officers and employees. The Managers are authorized to compensate officers for service provided to the Company prior to the execution of this Agreement.

(d) If the Managers appoint a chairperson, that individual shall preside at all meetings of the Members and the Managers at which he or she is present. He or she shall exercise and perform such other powers and duties as may be assigned to him or her by the Managers or prescribed by this Agreement. The chairperson may also perform the duties of the president enumerated in subsection (e), in which case he or she shall also be known as chief executive officer.

(e) The president shall be chief executive officer of the Company and shall have general and active management of the business of the Company, subject to the control of the Managers and the supervisory powers, if any, delegated by the Managers to the chairperson. The president

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

shall see that all orders and resolutions of the Members and the Managers are given effect and shall have the general powers and duties of management that are usually vested in the office of president of a corporation and shall have such other powers and duties as may be prescribed by the Managers or by this Agreement.  The president shall have authority to execute in the name of the Company bonds, contracts, leases, mortgages, and other written instruments to be executed by the Company, except where the signing or execution thereof shall be delegated by the Managers to some other officer or agent of the Company.

(f) If the Managers appoint a vice president or vice presidents, he, she, or they shall, in the absence or disability of the president, perform the duties and exercise the powers of president and shall perform such other duties and exercise such other powers as the Managers prescribe.  If more than one vice president is appointed, the Managers shall determine their order by resolution.

(g) The secretary shall attend all meetings of the Members and the Managers and shall take the minutes of the meetings.  If the secretary is unable to attend, the secretary or the presiding officer at the meeting shall appoint another person to take the minutes of the meeting. The secretary shall keep or cause to be kept at the principal executive office of the Company a minute book of all meetings and actions of the Members and the Managers.  The secretary shall perform the foregoing duties for any standing committees when it is required.  The secretary shall give or cause to be given notice of all meetings of the Members and the Managers and shall perform such other duties as may be prescribed by the Managers.  The secretary shall keep the seal of the Company, if any, in safe custody and shall have authority to affix that seal to any instrument requiring it, and, when it is so affixed, it may be attested by his or her signature.

The secretary shall keep or cause to be kept at the principal executive office or at the office of the Company's resident agent, as determined by the resolution of the Managers, a register or duplicate register, showing the names and addresses of all Members, and the Percentage Interest of each.  The secretary shall also keep all documents prescribed in Section 8.1 and such other documents as may be required by the Act.  The secretary shall have the general duties, powers and responsibilities of the secretary of a corporation and shall have such other powers and duties as may be conferred by the Managers or prescribed in this Agreement.

At the discretion of the Managers, an assistant secretary or assistant secretaries may be appointed to perform the duties and exercise the powers of the secretary at those times when the secretary is absent, disabled, or otherwise unable to act.

(h) The chief financial officer shall keep and maintain or cause to be kept and maintained accurate and complete books and records of accounts of all of the Company's properties and business transactions, including, without limitation, accounts of its assets, liabilities, receipts, disbursements, gains, losses, and Membership Interests.  The foregoing books and records shall be open for inspection during normal business hours and at any other reasonable time for inspection by any Manager.

The chief financial officer shall keep in safe custody the funds and securities of the Company, shall keep full and accurate accounts of receipts and disbursements in the Company books, and shall deposit all monies and other valuable assets in the name of and to the credit of

ABC IP, LLC
*Operating Agreement*

Page 20 of 34

**EXHIBIT A**

the Company in such depositories as may be designated by the Managers. The chief financial officer shall disburse funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements and shall render to the president and the Managers at their meetings, or, when the Members so require, at a meeting of the Members, an account of all of his or her transactions on behalf of the Company and of the financial condition of the Company.

The chief financial officer shall perform such other duties and shall have such other authority as may be prescribed in this Agreement or by the Managers. The chief financial officer shall have the general powers, responsibilities, and duties of the chief financial officer of a corporation and shall be the chief financial and accounting officer of the Company.

The Managers may, in their sole discretion, appoint an assistant treasurer or assistant treasurers who shall perform the duties and exercise the powers of the chief financial officer in the event of his or her absence, disability, or other inability to act as chief financial officer and to perform such other duties and exercise such other authority as the Managers may determine.

## ARTICLE VI.
## ALLOCATION OF PROFIT AND LOSS

**6.1**. **Compliance with the Code and Regulations.**

The Company intends to comply with the Code and all applicable Regulations, including without limitation the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

**6.2**. **Net Profits.**

Except as specifically provided elsewhere in this Agreement, Distributions of Net Profit shall be made to Members in proportion to their Percentage Interest in the Company.

**6.3**. **Net Losses.**

Except as specifically provided elsewhere in this Agreement, Net Losses shall be allocated to the Members in proportion to their Percentage Interest in the Company. However, the foregoing will not apply to the extent that it would result in a Negative Capital Account balance for any Member equal to the Company Minimum Gain which would be realized by that Member in the event of a foreclosure of the Company's assets. Any Net Loss which is not allocated in accordance with the foregoing provision shall be allocated to other Members who are unaffected by that provision. When subsequent allocations of profit and loss are calculated, the losses reallocated pursuant to this provision shall be taken into account such that the net amount of the allocation shall be as close as possible to that which would have been allocated to each Member if the reallocation pursuant to this section had not taken place.

ABC IP, LLC
*Operating Agreement*

Page 21 of 34

**EXHIBIT A**

**6.4. Regulatory Allocations.**

Notwithstanding the provisions of Section 6.3, the following applies:

(a) Should there be a net decrease in Company Minimum Gain in any taxable year, the Managers shall specially allocate to each Member items of income and gain for that year (and, if necessary, for subsequent years) as required by the Regulations governing "minimum gain chargeback" requirements, Section 1.704-2(f) [26 C.F.R. § 1.704-2(f)] prior to making any other allocations.

(b) Should there be a net decrease in Company Minimum Gain based on a Member Nonrecourse Debt in any taxable year, the Managers shall first determine the extent of each Member's share of the Company Minimum Gain attributable to Member Nonrecourse Debt in accordance with Regulations Section 1.704-2(i)(5) [26 C.F.R. § 1.704-2(i)(5)]. The Managers shall then specially allocate items of income and gain for that year (and, if necessary, for subsequent years) in accordance with Regulations Section 1.704-2(i)(4) [26 C.F.R. § 1.704-2(i)(4)] to each Member who has a share of the Company Nonrecourse Debt Minimum Gain.

(c) The Managers shall allocate nonrecourse deductions for any taxable year to each Member in proportion to his or her Percentage Interest.

(d) The Managers shall allocate Member Nonrecourse Deductions for any taxable year to the Member who bears the risk of loss with respect to the nonrecourse debt to which the Member Nonrecourse Deduction is attributable, as provided in Regulations Section 1.704-2(i) [26 C.F.R. § 1.704-2(i)].

(e) If a Member unexpectedly receives any allocation of loss or deduction, or item thereof, or distributions which result in the Member's having a Negative Capital Account balance at the end of the taxable year greater than the Member's share of Company Minimum Gain, the Company shall specially allocate items of income and gain to that Member in a manner designed to eliminate the excess Negative Capital Account balance as rapidly as possible. Any allocations made in accordance with this provision shall be taken into consideration in determining subsequent allocations under ARTICLE VI, so that, to the extent possible, the total amount allocated in this and subsequent allocations equals that which would have been allocated had there been no unexpected adjustments, allocations, and distributions and no allocation pursuant to Section 6.4(e).

(f) In accordance with Code Section 704(c) [26 U.S.C.A. § 704(c)] and the Regulations promulgated pursuant thereto, and notwithstanding any other provision in this Article, income, gain, loss, and deductions with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among Members taking into account any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this subsection are made solely for federal, state, and local taxes and shall not be taken into consideration in determining a Member's Capital Account or share of Net Profits or Net Losses or any other items subject to Distribution under this Agreement.

**6.5. Distributions.**

The Managers may elect, by majority vote, to make a Distribution of assets at any time that would not be prohibited under the Act or under this Agreement. Such a Distribution shall be

ABC IP, LLC
*Operating Agreement*

made in proportion to the unreturned capital contributions of each Member until all contributions have been paid, and thereafter in proportion to each Member's Percentage Interest in the Company. All such distributions shall be made to those Persons who, according to the books and records of the Company, were the holders of record of Membership Interests on the date of the distribution. Subject to Section 6.6, neither the Company nor any Manager shall be liable for the making of any distributions in accordance with the provisions of this section.

(a)     Tax Distributions.

      i.     The Company shall make mandatory tax distributions (the "**Tax Distributions**") to each Member in an amount equal to the product of:

            i.     The Member's allocable share of the Company's taxable income for the relevant fiscal year or period, as determined by the Company's accountants in accordance with applicable tax laws, and

            ii.     The highest marginal federal and state income tax rate applicable to an individual resident in Delaware (or such other state as may be determined by the Managing Members or the Board of Directors), including any applicable self-employment taxes.

For the purposes of calculating the Tax Distributions, the Company shall take into account any federal, state, and local taxes that may apply, including those that may be applicable to specific Members based on their tax residency.

(b)     Timing of Tax Distributions

The Tax Distributions shall be made to the Members on or before April 15th of each year (or such other date as federal income tax returns are due for individuals without extension), based on the estimated taxable income for the previous fiscal year.

The Company may, at the discretion of the Managers or the Board of Directors, make additional Tax Distributions throughout the fiscal year to account for any significant changes in the Company's estimated taxable income or changes in applicable tax rates.

(c)     Adjustments and True-Ups

If the actual taxable income of the Company for a fiscal year differs from the estimated taxable income, the Company shall make an adjusting Tax Distribution or require a refund of any excess Tax Distribution within 60 days of the filing of the Company's tax return.

In the event of an adjustment, the Managers shall provide each Member with a statement showing the calculation of the adjustment and any amounts due to or from each Member.

**6.6. Limitations on Distributions.**

(a) The Managers shall not make any distribution if, after giving effect to the distribution:

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

(1) the Company would not be able to pay its debts as they become due in the usual course of business; or

(2) the Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of distribution, to satisfy the preferential rights of other Members upon dissolution that are superior to the rights of the Member receiving the distribution.

(b) The Managers may base a determination that a distribution is not prohibited under this section on any of the following:

(1) financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances;

(2) a fair valuation; or

(3) any other method that is reasonable under the circumstances.

(c) Except as provided in Corp. Code, § 17254(e), the effect of a distribution under this section is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days after the date of authorization.

(d) A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act, if it is established that the Member or Manager did not act in compliance with this section or Section 6.5 or Section 9.3.

**6.7. Return of Distributions.**

Members shall return to the Company any distributions received which are in violation of this Agreement or the Act. Such distributions shall be returned to the account or accounts of the Company from which they were taken in order to make the distribution. If a distribution is made in compliance with the Act and this Agreement, a Member is under no obligation to return it to the Company or to pay the amount of the distribution for the account of the Company or to any creditor of the Company.

**6.8. Members Bound by These Provisions.**

The Members understand and acknowledge the tax ramifications of the provisions of this Article of the Agreement and agree to be bound by these provisions in reporting items of income and loss relating to the Company on their federal and state income tax returns.

## ARTICLE VII.
## TRANSFERS AND TERMINATIONS OF MEMBERSHIP INTERESTS

**7.1. Restriction on Transferability of Membership Interests.**

A Member may not transfer, assign, encumber, or convey all or any part of his or her Membership interest in the Company, except as provided herein. In entering into this

ABC IP, LLC
*Operating Agreement*

**EXHIBIT A**

Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships among the Members.

## 7.2. Permitted Transfers.

In order to be permitted, a transfer or assignment of all or any part of a Membership interest must have the approval of the Managers of the Company. Each Manager, in his or her sole discretion, may proffer or withhold approval. In addition, the following conditions must be met:

(a) the transferee must provide a written agreement, satisfactory to the Members, to be bound by all of the provisions of this Agreement;

(b) the transferee must provide the Company with his or her taxpayer identification number and initial tax basis in the transferred interest;

(c) the transferee must pay the reasonable expenses incurred in connection with his or her admission to Membership;

(d) the transfer must be in compliance with all federal and state securities laws;

(e) the transfer must not result in the termination of the Company pursuant to Code Section 708 [26 U.S.C.A. § 708];

(f) the transfer must not render the Company subject to the Investment Company Act of 1940, as amended [15 U.S.C.A. §§ 80a-1]; and

(g) the transferor must comply with the provisions of Section 7.3.

## 7.3. Company's Right to Purchase Transferor's Interest.

Any Member who wishes to transfer all or any part of his or her interest in the Company shall immediately provide the Company with written notice of his or her intention. The notice shall fully describe the nature of the interest to be transferred. Thereafter, the Company, or its nominee, shall have the option to purchase the transferor's interest at a price equal to the fair market value of the interest as determined by a third-party valuation expert selected by majority vote of the members.

(a) The option provided to the Company shall be irrevocable and shall remain open for thirty (30) days from the date that notice is given, except that if notice is given by regular mail, the option shall remain open for thirty-five (35) days from the date that notice is given to the Company.

(b) At any time while the option remains open, the Company (or its nominee) may elect to exercise the option and purchase the transferor's interest in the Company. The transferor Member shall not vote on the question of whether the Company should exercise its option.

(c) If the Company chooses to exercise its option to purchase the transferor's interest, it shall provide written notice to the transferor within the option period. The notice shall specify a closing date for the purchase, which shall occur within thirty (30) days of the expiration of the option period. On the closing date, the transferor shall be paid in cash the purchase price and shall deliver an instrument of title, free of any encumbrances and containing warranties of title,

ABC IP, LLC
*Operating Agreement*

Page 25 of 34

**EXHIBIT A**

conveying his or her interest in the Company.

(d) If the Company declines to exercise its option to purchase the transferor Member's interest, the transferor Member may then transfer his or her interest in accordance with Section 7.2. Any transfer not in compliance with the provisions of Section 7.2 shall be null and void and have no force or effect.

**7.4. Withdrawal from Membership.**

In the event that a Member withdraws in accordance with Section 4.3, the Company and the Remaining Members shall purchase the interest of the withdrawing Member in the manner described in Section 7.5.

**7.5. Purchase of Interest of Departing Member.**

The purchase price of a Departing Member's interest shall be determined in accordance with the procedure provided in Section 7.3.

(a) Once a value has been determined, each Remaining Member shall be entitled to purchase that portion of the Departing Member's interest that corresponds to his or her percentage ownership of the Percentage Interests of those Members electing to purchase a portion of the Departing Member's interest in the Company.

(b) Each Remaining Member desiring to purchase a share of the Departing Member's interest shall have thirty (30) days to provide written notice to the Company of his or her intention to do so. The failure to provide notice shall be deemed a rejection of the opportunity to purchase the departing Member's interest.

(c) If any Member elects not to purchase all of the Departing Member's interest to which he or she is entitled, the other Members may purchase that portion of the Departing Member's interest. Any interest which is not purchased by the Remaining Members shall be purchased by the Company.

(d) The Managers shall assign a closing date within sixty (60) days after the Members' election to purchase is completed. At that time, the Departing Member shall deliver to the Managers and the Remaining Members an instrument of title, free of any encumbrances and containing warranties of title, duly conveying his or her interest in the Company and, in return, he or she shall be paid the purchase price for his or her interest in cash. The Departing Member, the Managers and the Remaining Members shall perform all acts reasonably necessary to consummate the transaction in accordance with this Agreement.

**7.6. No Release of Liability.**

Any Member or Departing Member whose interest in the Company is sold pursuant to this Article is not relieved thereby of any liability he or she may owe the Company.

**EXHIBIT A**

### 7.7 Dissociation

(a) A Person ceases to be a Member on the happening of any of the following events (a **"Dissociation Event"**)

(i) The withdrawal of a Member with the consent of a Majority of the remaining Members;

(ii) A Member becoming a Bankrupt Member.

(iii) In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person estate;

(iv) In the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(v) In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(vi) In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(vii) In the case of a Member which is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

(b) In the event any Member disassociates prior to the expiration of a stated term of existence as set forth in the Articles of Organization, or in this Agreement, the Member is entitled to the fair market value of their membership interest as determined by an independent third party valuation expert at the time of the Dissociation Event, to be paid within six (6) months of the date of dissociation. Notwithstanding the foregoing, if the dissociation is as a result of the death or incompetence of the Member, the Managers may pay the actual market value of the Member's Membership Interest in the Company out over a period not to exceed five (5) years, provided that the dissociating Member is entitled to participate as an Assignee in the Company until the value of such interest (plus interest at the Default Interest Rate) is paid in full. The value of the Member's Membership Interest includes the amount of any Distributions to which the Member is entitled under the Agreement and the fair value of the Member's Membership Interest as of the date of dissociation, based upon the Member's right to share in distributions from the Company, reduced by any damages sustained by the Company as a result of the Member's dissociation.

(c) Notwithstanding anything herein to the contrary, if the dissociation is a consensual withdrawal pursuant to Section 7.7(a)(i) above, then the disposition of the Member's interest is to be provided in the terms of the consent to withdraw.

**EXHIBIT A**

## ARTICLE VIII.
## BOOKS, RECORDS, AND REPORTING

**8.1. Books and Records.**

The Managers shall maintain at the Company's principal place of business, or other location agreed upon by the Managers, the following books and records:

(a) a current list of the full name and last-known business or residence address of each Member and Manager set forth in alphabetical order, together with the Capital Contribution, Capital Account, and Membership Interest of each Member;

(b) a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) a copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) the books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) true and correct copies of all relevant documents and records indicating the amount, cost and value of all of the property and assets of the Company.

**8.2. Accounting Methods.**

The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

**8.3. Reports.**

The Managers shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Managers shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns. The Managers shall send to each Member within ninety (90) days of the conclusion of the taxable year:

(a) all information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns and

(b) a copy of the Company's federal, state, and local income tax or information returns for the taxable year.

ABC IP, LLC
*Operating Agreement*

Page 28 of 34

**EXHIBIT A**

## 8.4. Inspection Rights.

For purposes reasonably related to their interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Managers shall provide Members with copies of all Company records and documents to which Members are entitled under the Act.

## 8.5. Bank Accounts.

The Managers shall maintain all of the funds of the Company in a bank account or accounts in the name of the Company, at a depository institution or institutions to be determined by the majority of the Managers. The Managers shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. The Managers shall have the powers enumerated in Section 5.4 with respect to endorsing, signing, and negotiating checks, drafts, or other evidence of indebtedness to the Company or obligating the Company to pay money to a third party.

## 8.6. Partnership Representative.

The Company designates Cole LeLeux as Partnership Representative, as defined in Code Section 6223(a) [26 U.S.C.A. § 6223(a)] to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations.

## ARTICLE IX.
## DISSOLUTION, LIQUIDATION, AND WINDING UP

## 9.1. Conditions Under Which Dissolution Shall Occur.

The Company shall dissolve and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) at the time specified in the Articles;

(b) upon the happening of a Dissolution Event, and the failure of the Remaining Members to elect to continue, in accordance with Section 7.4;

(c) upon the vote of a two-thirds majority of the Members to dissolve;

(d) upon the entry of a decree of judicial dissolution pursuant to the Act;

(e) upon the happening of any event specified in the Articles as causing or requiring dissolution; or

(f) upon the sale of all or substantially all of the Company's assets.

## 9.2. Winding Up and Dissolution.

If the Company is dissolved, the Managers shall wind up its affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's

ABC IP, LLC                                                                 Page 29 of 34
*Operating Agreement*

**EXHIBIT A**

creditors of the commencement of dissolution proceedings.

**9.3. Order of Payment.**

After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members or Managers who are creditors of the Company, the Managers shall distribute the remaining assets among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Section 6.4. Members shall not be required to restore Negative Capital Account Balances.

**9.4. Members' Receipt of Payment.**

Except as otherwise provided in this Agreement or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Net Profits from any individual Member or Manager, except as provided in Article X.

**9.5. Certificates to Be Filed.**

Upon the dissolution of the Company, the Managers shall file a Certificate of Dissolution with the Secretary of State. After the winding up of the Company's affairs has been completed, the Managers shall file a Certificate of Cancellation of the Articles of Organization with the Secretary of State.

## ARTICLE X.
### INDEMNIFICATION OF AGENTS

The Company shall indemnify any Member or Manager and may indemnify any Person to the fullest extent permitted by law on the date such indemnification is requested for any judgments, settlements, penalties, fines, or expenses of any kind incurred as a result of that Person's performance in the capacity of Member, Manager, officer, employee, or agent of the Company, as long as the Member, Manager, or Person did not behave in violation of Sections 5.8 and 5.9.

## ARTICLE XI.
### MISCELLANEOUS PROVISIONS

**11.1. Assurances.**

Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the Managers and the Company or required by this Agreement or the Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

ABC IP, LLC                                                              Page 30 of 34
*Operating Agreement*

**EXHIBIT A**

**11.2. Complete Agreement.**

This Agreement and the Articles constitute the complete and exclusive statement of the agreement among the Members with respect to the matters discussed herein and therein and they supersede all prior written or oral statements among the Members, including any prior statement, warranty, or representation.

**11.3. Section Headings.**

The section headings which appear throughout this Agreement are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

**11.4. Binding Effect.**

Subject to the provisions of this Agreement relating to the transferability of Membership interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

**11.5. Interpretation.**

All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member or his or her counsel.

**11.6. Company Counsel.**

Company counsel may also be counsel to any Member, Manager, or Affiliate of a Member or Manager, if a majority of the Members who are not individually represented by such counsel agree. The Managers may execute on behalf of the Members and the Company any written consents to such representation as may be required by the Delaware Rules of Professional Conduct or the rules governing professional conduct in other jurisdictions. The Members acknowledge and agree that Company counsel owes them no direct duties and that Company counsel's duties shall be owed to the Company and to any Member or Manager or Affiliate of a Member or Manager which he or she represents individually.

**11.7. Applicable Law.**

Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not the law of conflicts, of the State of Delaware.

**11.8. Jurisdiction and Venue.**

ABC IP, LLC
*Operating Agreement*

Page 31 of 34

**EXHIBIT A**

Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of Texas, County of Travis in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail addressed as provided in Exhibit A attached hereto, and that when service is so made, it shall be as if personal service was effected within the State of Texas.

**11.9**. **Specific Performance.**

The Members acknowledge and agree that irreparable injury shall result from a breach of this Agreement and that money damages will not adequately compensate the injured party. Accordingly, in the event of a breach or a threatened breach of this Agreement, any party who may be injured shall be entitled, in addition to any other remedy which may be available, to injunctive relief to prevent or to correct the breach.

**11.10**. **Reserved.**

**11.11**. **Remedies Cumulative.**

The remedies described in this Agreement are cumulative and shall not eliminate any other remedy to which a Person may be lawfully entitled.

**11.12**. **Notices.**

Any notice or other writing to be served upon the Company or any Member thereof in connection with this Agreement shall be in writing and shall be deemed completed when delivered to the address specified in Exhibit A, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days' written notice to the Company and the other Members.

**11.13**. **Amendments.**

Any amendments, modifications, or alterations to this Agreement or the Articles must be in writing and signed by all of the Members.

**11.14**. **Severability.**

Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of the Agreement which shall continue in full force and effect.

**EXHIBIT A**

**11.15**. **Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

IN WITNESS WHEREOF, all of the Members of ABC IP, LLC, A Delaware Limited-Liability Company, have executed or caused to be executed this Agreement, effective as of the date set forth at the commencement of the document.

By: _____  9-18-24

Lawrence DeMonico on behalf of LAD, LLC

By: _____  9/17/24

Kevin Maxwell on behalf of An 1861, LLC

By: _____  9/18/2024

Cole Leleux on behalf of Leleux, LLC

By: _____  9/18/24

Michael Register on behalf of Spider Hole, LLC

ABC IP, LLC                                                                  Page 33 of 34
*Operating Agreement*

**EXHIBIT A**

## EXHIBIT A
## MEMBERS AND MANAGERS OF ABC IP, LLC, LLC, AS OF OCTOBER 21, 2023

| MEMBER'S NAME | MEMBER'S ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|
| LAD, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 27.5 |
| An 1861, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 17.5 |
| Leleux, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 27.5 |
| Spider Hole, LLC | 255 Primera Blvd, Suite 160 Lake Mary, FL 32746 | $[*_____*] | 27.5 |
| | | $0.00 Total capital | 100% |

Managers:

Lawrence DeMonico
6124 Osceola Trail
Austin, TX 78738

Kevin Maxwell
1095 Torren Pt.
Geneva, FL 32732

Cole LeLeux
2118 White Jasmine Ct.
Apopka, FL 32712

Mike Register
110 Oakwood Dr.
Maitland, FL 32751

**EXHIBIT A**